# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

Plaintiff and Respondent,

v.

MANUEL BRACAMONTES,

Defendant and Appellant.

S139702

San Diego County Superior Court

SCD178329

April 11, 2022

Justice Corrigan authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Liu, Kruger, Groban, Jenkins, and Menetrez* concurred.

_____

* Associate Justice of the Court of Appeal, Fourth Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. BRACAMONTES

S139702

Opinion of the Court by Corrigan, J.

A jury convicted Manuel Bracamontes of the first degree murder of nine-year-old Laura Arroyo, with special circumstances for committing the murder while engaged in kidnapping, lewd act on a child under 14, and oral copulation.[1] A death sentence was returned and imposed.  We affirm.

## I. BACKGROUND

### A. *Guilt Phase*

#### 1. *Prosecution Evidence*

Luis and Laura Arroyo lived in a San Diego apartment complex with their children:  Augustine, aged 11; Jose, aged 10; and Laura, aged 9.[2]  Maggie Porter lived in the same complex with her three children, including four-year-old Jessica and an infant son, Manuel Jr.  Laura and Jessica were "best friends" and played together almost daily.  Defendant, Manuel Jr.'s

---

[1]    Penal Code sections 187, subdivision (a), 190.2, subdivision (a)(17)(B), (17)(E), (17)(F).  The jury also found true an enhancement for personal deadly weapon use (Pen. Code, § 12022, subd. (b)(1)) and convicted defendant of assault with a deadly weapon on a peace officer (Pen. Code, § 245, subd. (c)) in connection with an attempt to evade arrest.  The trial court struck the enhancement and imposed a concurrent midterm on the assault count.

[2]    To avoid confusion, we will refer to the younger Laura Arroyo as "Laura" and her mother as "Mrs. Arroyo."

1

father, had lived in the Porter apartment, but moved. After his departure, he was often seen at the complex.

On June 19, 1991, Laura came home from school and played outside with her friends, including preteens Elizabeth Alcarez and Leonor Gomez. Defendant greeted the girls as he walked past them toward Porter's apartment. Defendant came back a second time and told Elizabeth her mother was looking for her. Laura went home with Elizabeth, but her mother said she had not been looking for her. The children played outside until just before 9:00 p.m., then Elizabeth walked Laura home and saw her go inside. Luis had come home from work about 8:30 p.m. Laura asked if she could play a bit longer and he agreed. At about the same time, a neighbor and his friend saw defendant walking toward the complex from his car. They invited him to join them but he declined. Defendant's black Volkswagen Jetta was seen leaving the complex about 20 minutes later.

Once home, Laura went upstairs and watched television with her mother. Five minutes later, the doorbell rang and Laura went downstairs to answer it. Mrs. Arroyo heard Laura asking, "Who is it?" but heard nothing else. A few minutes after that, Mrs. Arroyo went downstairs and noticed the front door and metal security door were ajar. Thinking nothing was amiss, she began cooking. When Luis and his sons came downstairs, Mrs. Arroyo sent one of the boys to look for Laura. He could not find her, and they noticed Laura's shoes were inside. The entire family went searching for Laura. Unsuccessful, they called police at 9:31 p.m. Officers and neighbors searched for Laura throughout the night.

About 6:30 the next morning, Laura's body was found in the parking lot of an industrial complex in Chula Vista, three-and-a-half miles from her home. She lay on her back, wearing pink pajamas and underwear. She had been stabbed at least 10 times in the upper body and torso. The concrete beneath her had been chipped away at various spots, and her wounds were consistent with having been stabbed with a pickaxe. Petechial hemorrhaging indicated strangulation. Other injuries included a broken nose and chipped teeth, along with bruising and lacerations. Although her genitalia bore no signs of sexual assault, swabs were collected from her mouth, vagina, anus, and neck. An initial examination did not reveal the presence of sperm.

Between July 14 and August 1, 1991, Chula Vista Police interviewed defendant four times. Initially, he claimed he first went to the apartment complex at about 9:45 in the evening, only after Porter called and told him about Laura's disappearance. He said he had not been to the complex in a week. He subsequently asserted he went to the complex earlier that day to pick up Manuel Jr. and returned that afternoon to drop off the baby. He denied any involvement with Laura's disappearance and insisted he never spoke to Laura or any of the neighborhood girls. Defendant ultimately refused to answer more questions but did provide hair, blood, and saliva samples.

On August 1, 1991, pursuant to warrant, officers searched defendant's residence and car, seizing clothing and tools. These items, along with evidence recovered during the autopsy, were sent to an FBI lab. A blue-green fiber found on Laura's pants was deemed potentially consistent with a fiber from a sweater found at defendant's home and with other fibers recovered from

his car. At the time, no other physical evidence tied him to Laura's murder.

Police investigated other leads. Mrs. Arroyo and three others reported seeing a suspicious brown car parked in a cul-de-sac near the complex. Neither the car nor any occupants were ever identified. Officers also investigated a dispute over the Arroyos' sale of their taco shop but found no link to the abduction. In June 1992, approximately a year after the killing, police spoke again with defendant, who continued to deny any involvement. No new evidence was uncovered.

Eleven years later, the San Diego County District Attorney's Office established a "cold case" unit, and the evidence in Laura's case was reexamined in 2003. Chula Vista Police also sought assistance from the San Diego Police crime lab. New slides were prepared from the autopsy swabs using a method that had not been employed in 1991. The new slides revealed the presence of sperm in swabs from Laura's mouth, neck, and fingernails. A DNA profile was developed and found to match DNA taken from defendant's hair sample. The probability of a random match was one in 2.7 trillion in the Latino population, one in 3.2 trillion among Caucasians, and one in nine trillion among African-Americans. Laura's pajamas were placed under an alternate light source which revealed biological matter. Tested samples from the garment confirmed the presence of sperm. The resulting DNA profile matched defendant's reference sample. The likelihood of a random match was one in 30 quadrillion.

On October 24, 2003, more than 12 years after Laura's murder, district attorney investigators Robert Marquez and Michael Howard went to Porter's apartment looking for

defendant. Manuel Jr. said his mother was not home, but defendant was expected to pick him up shortly. While the investigators waited in their car, defendant arrived and parked his Ford Explorer in front of the apartment. As Manuel Jr. approached the car, the investigators drove up and stopped in front of the Explorer. Marquez approached defendant and identified himself. Howard drew his gun, opened the passenger door, and told defendant he was under arrest for murder. Defendant initially raised his hands but then sped off. Howard fired twice toward the fleeing car.

Early the next morning, officers saw defendant's Explorer parked at a Chula Vista motel and placed a tracking device on it. About 10:30 a.m., the device indicated defendant had left the motel. Two officers in separate marked patrol cars found the Explorer parked in an alley. After blocking either end of the alley, officers approached on foot. Defendant started the engine and made a U-turn as officers drew their guns and ordered him to stop. He sped past them and drove over a curb to escape. After a high-speed freeway chase, defendant lost control of his car, crashed, and was arrested.

### 2. *Defense Evidence*

Five years after the murder and eight years before the cold case review, Chula Vista Police Detective Susan Rodriguez looked into the case. Defendant's Jetta, which had been sold, was reexamined in vain. Latent fingerprints from the Arroyos' front door did not match his. Rodriguez also recontacted a psychic who had been consulted during the initial investigation. No new leads were developed. Evidence from Laura's body was not reexamined because Rodriguez had no reason to doubt the medical examiner's conclusion ruling out sexual assault.

Manuel Jr. testified that when Marquez and Howard first approached him at the apartment they only identified themselves by name.[3] They refused to tell defendant why he was being arrested and both men shot at defendant's fleeing car. Several other witnesses testified about the attempted arrest. Defendant checked into a motel later that night using his real name.

### B. *Penalty Phase*

#### 1. *Prosecution Evidence*

Laura's parents and two brothers described the impact of her life and murder. Laura wanted to be a high school cheerleader and then a teacher, a role she often assumed while playing with friends. She was friendly with everyone and her mother's constant companion. The family trip to Disneyland was replaced by Laura's funeral. Laura was buried in the dress she was to wear for her first communion. Laura's brothers were afraid to go anywhere after the murder. The family kept Laura's room unchanged for six years after her death and still visited her grave every Sunday and on her birthday. Mari Peterson, Laura's third grade teacher, testified about the impact of Laura's death on her and her class. The jury was also shown a two-and-a-half minute video of an interview between Peterson and Laura filmed a few weeks before the crimes.

In June 1996, Porter told defendant she wanted to end their relationship and he became violent. He refused to leave, pushed her, and held her down by the arm and neck. Photos

---

[3] In rebuttal, the prosecution presented evidence of an audiotape of the investigators' interaction with Manuel Jr. in which Marquez identified himself as being a district attorney investigator.

showed abrasions to Porter's upper body. Defendant pled guilty to inflicting corporal injury on the mother of his child.[4]

### 2. *Defense Evidence*

Twenty-one defense witnesses testified that defendant was incapable of committing the murder. Porter related she married defendant shortly before trial and believed he was not capable of killing Laura. Porter's ex-husband gave similar testimony. Porter's two adult children described defendant as a good father who never said or did anything inappropriate with them. Family members described defendant's childhood as normal and not marked by abuse. He played with his siblings, participated in Little League, and cared for his pets. As an adult, defendant was supportive of his family and a good father to Manuel Jr. After his father was injured in a car accident and confined to bed for two years, defendant helped care for him and the family. He also comforted his sister when her husband was fatally shot. He never acted inappropriately with his sisters or nieces. A work supervisor testified he was a hard worker who got along with others.

## II. DISCUSSION

### A. *Pretrial Issues*

#### 1. *Prefiling Delay*

While the murder occurred in June 1991, defendant was not charged until October 2003. He argues the delay was unjustified and denied him due process because some evidence he could have presented, particularly schooling and employment

---

[4]     Penal Code section 273.5, subdivision (a).

evidence for the penalty phase, became unavailable during that time. We reject the claim.

### a. Background

The defense argued that all charges should be dismissed because the prefiling delay violated due process. The trial court heard from numerous witnesses, primarily related to potential prejudice from lost evidence. Elementary and high school employees testified that, although records of enrollment are kept permanently, other student files are usually destroyed after five years. Defendant graduated from high school in 1981, 10 years before Laura's murder. Several of defendant's elementary school teachers had died by the time of the 2005 hearing; two others did not remember him. Representatives from seven companies where defendant worked between 1979 and 1993 testified as to defendant's employment records and pay stubs, with most indicating that detailed records were either never kept or were no longer available. The defense also presented evidence that three people who had a positive impression of defendant had passed away. Defendant also suggested that evidence regarding an alarm system at his parents' house and record of a U-Haul truck his sister rented for her move supported his alibi but had been lost. Guadalupe Echeverria, whom the defense claimed was unhappy following her purchase of the Arroyos' taco shop (see discussion *post*), had died in December 1991.

In its opposition, the prosecution asserted the delay was justified. It observed that the initial medical examination of the victim's body in 1991 did not reveal the presence of sperm or injuries consistent with sexual assault, and the victim's clothing was intact, leading the medical examiner to conclude no such

assault had occurred. Police searched defendant's car and home and repeatedly interviewed him. The blue-green fiber from the victim's pajamas may have matched fibers from defendant's car and clothing, but the result was inconclusive. It was not until 2003 that a reexamination of evidence revealed sperm on swabs from the victim and a subsequent DNA test linked the sperm to defendant. Expert testimony explained that, in 1991, a water-based extraction method was used to transfer evidence from a swab to a slide for examination. It was later discovered that this method, in contrast to a detergent-based method used in 2003, was often ineffective and may have led to false negative results. Further, the restriction fragment length polymorphism DNA tests prevalent in 1991 required more material for testing than was present on the oral swabs. Defendant's sister Teresa also testified that friends and family remained available to testify about defendant's life, which she described as normal and unaffected by childhood abuse or involvement with gangs, alcohol, or drugs. A prosecution investigator testified defendant's employers at the time of the murder remembered him and that he had been disciplined for failing to perform assigned duties and threatening a supervisor.

The trial court denied defendant's motion. It concluded that the prosecution could not reasonably bring charges in 1991 based on the uncertain state of the evidence. The court balanced the justification for the delay with any potential prejudice. It held the strong public interest in prosecution outweighed any potential prejudice. The defense unsuccessfully renewed its motion to dismiss at the penalty phase, arguing the charging delay resulted in an "incomplete picture" of defendant being presented to the jury.

### b. *There Was No Prejudicial Prefiling Delay*

"Although precharging delay does not implicate speedy trial rights, a defendant is not without recourse if the delay is unjustified and prejudicial. '[T]he right of due process protects a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence.' [Citation.] Accordingly, '[d]elay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions. A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay.'" (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250 (*Nelson*).)

*Nelson* observed that both negligent and purposeful charging delay, if accompanied by a showing of prejudice, can violate due process. "This does not mean, however, that whether the delay was purposeful or negligent is irrelevant . . . . [W]hether the delay was negligent or purposeful is relevant to the balancing process. Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation. If the delay was merely negligent, a greater showing

of prejudice would be required to establish a due process violation."[5] (*Nelson, supra,* 43 Cal.4th at pp. 1255–1256.)

No prejudicial delay appears here. Defendant argues the charging delay was unjustified because evidence of sperm on the victim's clothing and, thus, defendant's DNA, could have been detected sooner using technology available at the time. We rejected a similar argument in *Nelson*, where the defendant argued "the DNA technology used here existed years before law enforcement agencies made the comparison in this case and that, therefore, the comparison could have, and should have, been made sooner than it actually was." (*Nelson, supra,* 43 Cal.4th at p. 1256.) We cautioned there that "[a] court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case." (*Ibid*.) Similarly here, the initial investigation into Laura's killing suggested a sexual assault was not involved. The medical examination of the victim's body did not reveal a sexual assault. The victim's clothing was intact and her genitalia uninjured. Swabs collected from her body did not reveal the presence of sperm. The medical examiner's conclusion that there had been no sexual assault, while reasonable, may have set back the investigation. Not until sperm was discovered later during a "cold case" review and a

---

[5] *Nelson* noted that state and federal constitutional standards regarding justification for delay differ. (*Nelson, supra,* 43 Cal.4th at p. 1251; see *United States v. Lovasco* (1977) 431 U.S. 783, 795–796; *United States v. Marion* (1971) 404 U.S. 307, 325–326.) *Nelson*, however, rested its holding on California's constitution because "the law under the California Constitution is at least as favorable for defendant in this regard as the law under the United States Constitution." (*Nelson*, at p. 1251.) We do so here as well.

DNA profile was produced did physical evidence connect defendant to the crimes. Indeed, defendant's initial connection to the murder was inconclusive. The only physical evidence linking him to the crimes was a single blue-green fiber that may have matched fibers found in his car and residence. He had been seen at the apartment complex just before Laura's disappearance, and he initially lied to police about being there. However, defendant denied involvement and no direct evidence linked him to the crimes. Further, the inability to detect sperm on the victim's body not only deprived investigators of DNA evidence but also a motive for Laura's murder. That his girlfriend's daughter and Laura were friends did little to explain why defendant would have killed the child.

Ultimately, "[t]he delay was investigative delay, nothing else." (*Nelson, supra,* 43 Cal.4th at p. 1256.) As we observed in *People v. Cordova* (2015) 62 Cal.4th 104 (*Cordova*): "Sometimes a crime simply is not solved immediately but must await some break in the case, a break that occurred here . . . when a cold hit revealed a match between defendant and the evidence samples." (*Id.* at p. 120.) As in *Nelson*: " 'The delay was the result of insufficient evidence to identify defendant as a suspect and the limits of forensic technology. [Citations.] When the forensic technology became available to identify defendant as a suspect and to establish his guilt, the prosecution proceeded with promptness.' " (*Nelson, supra,* 43 Cal.4th at p. 1257.) There is no indication that prosecution here was delayed to secure any improper advantage.

In any event, "if the defendant fails to meet his or her burden of showing prejudice, there is no need to determine whether the delay was justified." (*People v. Jones* (2013) 57 Cal.4th 899, 921.) The potential prejudice identified by

defendant appears minimal. As to the guilt phase, defendant asserts that the delay prevented adequate defense investigation into potential third-party culpability evidence, including the occupants of a brown car near the victim's apartment complex and the Arroyos' sale of a taco shop. (See discussion *post*.) Near the time of the crimes, several witnesses reported seeing a brown car, but no one could identify the car or its occupants. Defendant speculates that an earlier investigation would have identified these persons but does not suggest how the defense investigation was hindered. With respect to the taco shop sale, Echeverria died only five months after the murder. Defendant also does not suggest what evidence Echeverria would have provided that was not otherwise available.

As for the penalty phase, defendant broadly contends that "whole categories of evidence essential to presenting the jury with a full picture of appellant were lost," including school, employment, and medical records, as well as mitigation witnesses who passed away. The record belies this claim. Defendant presented 21 witnesses at the penalty phase who testified about his childhood and adult life; positive family interactions, favorable experiences and opinions; and testimony from a work supervisor. In light of this extensive presentation, any prejudice from the absence of additional similar evidence would appear minimal. Defendant does not explain how documentary evidence regarding his education, employment, or medical care would have bolstered the evidence presented. On this record, "the claimed prejudice is speculative" and "[d]efendant was able to, and did, present evidence in his defense . . . ." (*Cordova, supra,* 62 Cal.4th at p. 120.)

## 2. *Shackling*

Defendant contends the trial court improperly ordered him to wear leg chains during trial, which prejudiced him at both the guilt and penalty phases. Prejudice does not appear on this record.

### *a. Background*

Defendant moved to appear without physical restraints, pointing out that he had previously made court appearances without disruption. The court tentatively indicated it would deny the motion but explained that "Mr. Bracamontes will have . . . ankle cuffs on, that they be tethered to a bolt in the floor. His hands will not be shackled. He will not be waist chained. He will be free to stand, turn to talk to both counsel, certainly assist in his defense. [¶] What he will be prevented from doing is leaving counsel table, which he isn't allowed to do anyway. [¶] We'll make every effort to ensure that the panel is not aware that he is chained to the floor." When defense counsel argued defendant had been cooperative and had not been disruptive in the courtroom, the court noted that defendant had twice fled from police before being apprehended. The court also inquired whether it could consider the "mere fact of the charges and the potential penalty in the case . . . ." Both defense counsel responded that was not part of the inquiry whether there was a manifest need for restraints. Although agreeing with defense counsel that "Mr. Bracamontes has always been very respectful in court" and no instances of jail disruption had been reported, the court denied defendant's motion. If defendant chose to testify, the court indicated he would be allowed to walk to the stand "unimpeded" and "when he's excused, he's free to walk back and sit down. We'll make those arrangements." Defendant elected not to testify so this eventuality did not arise.

Later, outside the presence of prospective jurors, defense counsel commented that, the day before, "with the table turned facing the audience, that the jurors that were seated in the jury box, at least some of them could see that Mr. Bracamontes was shackled to the floor . . . . The wire was visible underneath the chairs at least to probably the six people that are closest to the bench." The "wire" was an apparent reference to the tether mentioned by the court. The court stated it was "not going to get rid of the panel" but asked the bailiff if counsel table could be turned. The bailiff responded, "I don't know how I can. There's more people at counsel table than expected, and there's more people in the way when he stands." The court replied, "We'll leave it the way it is," and defense counsel addressed another matter.

### b. *The Trial Court Abused Its Discretion*

" 'In general, the "court has broad power to maintain courtroom security and orderly proceedings" [citation], and its decisions on these matters are reviewed for abuse of discretion. [Citation.] However, the court's discretion to impose physical restraints is constrained by constitutional principles. Under California law, "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." [Citation.] Similarly, the federal "Constitution forbids the use of visible shackles . . . unless that use is 'justified by an essential state interest' — such as the interest in courtroom security — specific to the defendant on trial." . . . ' " (*People v. Bell* (2019) 7 Cal.5th 70, 123 (*Bell*).) "The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion." (*People v.*

*Duran* (1976) 16 Cal.3d 282, 291 (*Duran*).) " 'In deciding whether restraints are justified, the trial court may "take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." [Citation.] These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior.' " (*People v. Virgil* (2011) 51 Cal.4th 1210, 1270 (*Virgil*).)

As these authorities make clear, physical restraints are considered extraordinary measures. Courts entertaining such action must seriously consider the question on an individualized basis and ensure there is an adequate record for their ruling. Constitutional principles "prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." (*Deck v. Missouri* (2005) 544 U.S. 622, 629 (*Deck*).) The individualized consideration necessary before imposing restraints would be inconsistent with a blanket policy of shackling defendants charged with certain offenses, such as capital murder. (*People v. Hawkins* (1995) 10 Cal.4th 920, 944; *Duran, supra,* 16 Cal.3d at p. 293.) "The mere facts that the defendant is an unsavory character and charged with a violent crime are not sufficient to support a finding of manifest need." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 389–390 (*Bryant*).)

Defendant contends there was no manifest need to shackle him, noting the lack of any courtroom or jail incidents involving nonconforming behavior. However, the record here does not support defendant's assertion that the court relied primarily on a blanket policy to shackle capital murder defendants and failed

to consider his particular circumstances. The court did inquire at one point whether it could consider the present charges and commented that its prior handling of similar murder cases had "proved very successful in the past." Nonetheless, the court specifically cited as a relevant factor defendant's two attempts to evade arrest under dangerous circumstances.

A court's determination that a defendant constitutes a flight risk may justify a finding of manifest need for restraints. For example, in *Vigil*, we concluded there was no abuse of discretion in shackling the defendant because he "was a genuine escape risk" where he used "a makeshift key to unlock another inmate's handcuffs" and lied about it. (*Virgil, supra,* 51 Cal.4th at p. 1271; see *People v. Cunningham* (2001) 25 Cal.4th 926, 988 (*Cunningham*).) Further, a defendant's recent attempt to escape custody, or evidence of an intent to escape, could support a finding of a manifest need for restraints. (See *People v. Smith* (2015) 61 Cal.4th 18, 44; *People v. Livaditis* (1992) 2 Cal.4th 759, 774; *People v. Condley* (1977) 69 Cal.App.3d 999, 1006.)

However, our cases teach that a mere disposition to violence or escape standing alone cannot justify the use of restraints. "A court's decision about the use of restraints involves a prediction of the likelihood of violence, escape, or disruption weighed against the potential burden on the defendant's right to a fair trial. Given the serious potential consequences on both sides of the scale, the range of factors the court may consider in assessing and weighing the risks should be broad." (*Bryant, supra,* 60 Cal.4th at p. 390.) The necessary individualized assessment requires a determination, based on the totality of the circumstances, that a defendant presently intends to engage in nonconforming courtroom behavior, i.e., conduct that " 'would disrupt the judicial process if

unrestrained.'" (*People v. Cox* (1991) 53 Cal.3d 618, 651 (*Cox*), disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion." (*Duran, supra,* 16 Cal.3d at p. 291; see *People v. Montes* (2014) 58 Cal.4th 809, 841.)

A defendant's prearrest attempt to evade capture, standing alone, would not justify the use of physical restraints. *People v. Jacla* (1978) 77 Cal.App.3d 878 concluded no manifest need for shackling was shown where the defendant, while on bail, was involved in a shooting and an ensuing high-speed chase. The court explained: "We conceive *Duran* to hold that it is the defendant's conduct in *custody*, now or at other times [citations], or his expressed intention to escape or engage in nonconforming conduct during the trial that should be considered in determining whether there is a 'manifest need' for shackles." (*Jacla*, at p. 884; see also *People v. Burnett* (1980) 111 Cal.App.3d 661, 667.) This court quoted *Jacla* positively in *People v. Allen* (1986) 42 Cal.3d 1222. With respect to the shackling of a witness, *Allen* observed that "none of the evidence presented by the prosecution relates to [the witness's] present or past conduct in custody or in the courtroom, and most of the evidence seems of limited value in predicting [his] future conduct in the courtroom." (*Id.* at p. 1263.)

Similarly here, although defendant attempted to evade capture before his eventual arrest, there was no evidence that defendant harbored a present intent to escape from custody or otherwise disrupt court proceedings. The trial court agreed that defendant had "always been very respectful in court" and there had been no reports of misbehavior in custody. The ultimate

question remains whether there exists a manifest need for shackling or other restraint. The need must arise from a current risk of flight, violence, or other disruptive behavior. Although the court's consideration is not limited solely to custodial conduct, it must make a determination, based on the totality of the circumstances, that a manifest need for restraints currently exists. (See *Cox, supra,* 53 Cal.3d at p. 651.) The evidence was insufficient to justify such a determination here. Under these circumstances, the court abused its discretion by ordering the use of restraints.

Finally, we emphasize that the justification "in support of the court's determination to impose physical restraints must appear as a matter of record" (*Duran, supra,* 16 Cal.3d at p. 291). When restraints are requested by the prosecution, the People should place facts justifying their use on the record "so that the court may make its own determination of the nature and seriousness of the conduct and whether there is a manifest need for such restraints." (*People v. Simon* (2016) 1 Cal.5th 98, 115; cf. *People v. Miller* (2009) 175 Cal.App.4th 1109, 1114; *People v. Prado* (1977) 67 Cal.App.3d 267, 275–276.) We note the court may consider imposing restraints in the absence of a prosecutorial request. Further, and importantly, the court must ensure the record reflects both the reasons justifying the restraints, along with a description of "the type of restraints used [and] whether they were visible to the jury" (*People v. Jackson* (1993) 14 Cal.App.4th 1818, 1826). Of course, "[i]t is settled that the use of physical restraints in the trial court cannot be challenged for the first time on appeal. Defendant's failure to object and make a record below waives the claim . . . ." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 583 (*Tuilaepa*); see *People v. Majors* (1998) 18 Cal.4th 385, 406.) As such, if the

defense disagrees with the trial court's initial assessment of the visibility of the restraints at any point during trial, the defense should object so the trial court can make an appropriate record.

### c. *The Trial Record Does Not Establish Prejudice*

As the high court has stated, where a court improperly orders the use of visible physical restraints, "[t]he State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.'" (*Deck, supra,* 544 U.S. at p. 635; see *People v. Miracle* (2018) 6 Cal.5th 318, 350, fn. 6.) Defendant contends that "the shackles apparently remained in the jury's view for the duration of the trial." The record on direct appeal does not support this contention. Defense counsel commented during jury selection that, "with the table turned facing the audience," "at least some of" the prospective jurors could see the "wire," suggesting that it was visible "to probably the six people that are closest to the bench." The record does not indicate whether counsel table remained in the same location during trial, or any of the seated jurors ever saw the restraints. All that can be established is that, for an unspecified period of time during voir dire, some prospective jurors may have seen a portion of the "wire" used in the system. "Brief glimpses of a defendant in restraints have not been deemed prejudicial." (*Cunningham*, *supra*, 25 Cal.4th at p. 988; see *Duran, supra,* 16 Cal.3d at p. 287, fn. 2.)

"Even if the restraint had been glimpsed during that portion of voir dire by one or more of the prospective jurors who actually sat on the jury, the unjustified shackling was harmless beyond a reasonable doubt." (*People v. Ervine* (2009) 47 Cal.4th 745, 774.) As we reasoned in *Tuilaepa, supra,* 4 Cal.4th 569: "Strong guilt evidence in the form of eight positive eyewitness

identifications established that defendant shot four individuals and killed one of them in the course of robbing people in a neighborhood bar. No other guilt errors are raised on appeal or are evident from the record, and no prejudicial error occurred at the penalty phase for reasons we will explain. Defendant elected not to testify in his own behalf. Any glimpse jurors might have received of the restraints as defendant entered the courtroom could not possibly have shocked them or affected their assessment of the evidence." (*Id.* at pp. 584–585.) Similarly here, with respect to the guilt phase, strong DNA evidence tied defendant to the murder. The *lowest* probability for a random match among the samples was one in 2.7 trillion among the Latino population. Further, as discussed below, no other error appears on this record. The court, in deciding to order shackling, reassured the defense that if defendant decided to testify, he would be allowed to walk to and from the stand unrestrained, and there is no assertion that the restraints otherwise inhibited defendant's ability to assist in his defense.

Even assuming some jurors may have briefly glimpsed the restraints, the shackling error was also harmless beyond a reasonable doubt at the penalty phase. During jury argument, the prosecutor identified only three aggravating factors: the circumstances of the crime; defendant's age at the time of the offenses; and defendant's commission of a prior domestic violence incident. (See Pen. Code, § 190.3, factors (a), (b), (i).) Of these, the prosecutor focused primarily on the circumstances of the offense, calling it "one of the most important factors in this case." After acknowledging that defendant's lack of felony convictions constituted a mitigating factor, along with defense evidence regarding "any good things about [defendant's] life" (see Pen. Code, § 190.3, factors (c), (k)), the prosecutor argued

these factors were "extremely weak" compared to "the facts, circumstances of this case, like this one right here where her final resting place on that sidewalk is, it's like comparing tons to ounces." He graphically described the scene where the victim was found: "How about comparing all of those stab wounds to that little girl on that sidewalk, where she was impaled on that sidewalk, compare that to all the mitigation. I submit it makes the scale on this side go all the way to the ground. [¶] The chop wounds to the face and the other injuries to the face, shoulders, neck, each and every one of those facts, ladies and gentlemen, wipes out any weight, any slight weight that any of those items have on that mitigating side." The prosecutor described the impact of the murder on Laura's parents, brothers, her teacher, and classmates, then discussed Laura's potential future and how she might have experienced the crimes as they were happening. Thereafter, the prosecutor argued: "You have to put this now on that scale, ladies and gentlemen. When you compare all of these things on this side of the scale, everything we just talked about, including the assault on the cop, the pickaxe that he used, the lewd act on the child, these are the special circumstances, the forced oral [copulation]. And the kidnapping, ladies and gentlemen, the aggravating side of this scale outweighs the mitigating side of the scale like the Queen Mary outweighs a rowboat. Like a 6', 220-pound male outweighs a 61-pound third grade girl." The single reference to an "assault on the cop" was not explained, and the prosecutor did not otherwise mention defendant's flight from police during jury argument that spanned almost 30 pages of the reporter's transcript. Further, aside from the specific commission of a domestic violence incident, the prosecutor did not suggest that defendant had a violent background warranting the death

penalty. As noted, he acknowledged defendant's lack of felony convictions constituted a *mitigating* factor.

The defense acknowledged the prosecution's emphasis on the circumstances of the offense, with counsel commenting that, "as expected, the prosecutor has focused on the facts of the crime, because in this case that's really all that he has to talk about." Both defense counsel mentioned that defendant had no background of violence. This argument dovetailed into the two primary defense themes: that jurors should have a lingering doubt as to defendant's guilt based on the multiple defense witnesses who testified that defendant was incapable of committing the murder; and that life imprisonment was a sufficient punishment for the present crimes. Counsel discussed lingering doubt at length, arguing that the DNA evidence only linked defendant to the sexual assault and not the killing. They argued evidence suggested others must be involved and that no physical evidence tied Laura to defendant's car. They urged defendant had no history of child molestation, no history of having been abused himself, and no history of mental illness or drug addiction. All these facts were asserted to be inconsistent with defendant's guilt. Defense counsel suggested that DNA evidence may someday exonerate defendant. They also emphasized that defendant would not be eligible for parole and there was no evidence that defendant had posed a danger to anyone during the two years that he spent in custody awaiting trial because "[t]here were no assaults on any guards or other inmates."

"[V]isible physical restraints like handcuffs or leg irons may erode the presumption of innocence because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community." (*People v.*

23

*Hernandez* (2011) 51 Cal.4th 733, 742; cf. *Deck, supra,* 544 U.S. at pp. 632–633.) The record on direct appeal here reveals that the jury convicted defendant of the gruesome murder and sexual assault of a nine-year-old girl who had been kidnapped from her home. The prosecution's subsequent penalty phase argument focused primarily on the circumstances of this horrific crime, which the jury had previously assessed, rather than on defendant's dangerousness. The bulk of the defense case, both with respect to jury argument and the evidence presented, emphasized a theory of lingering doubt, a factor in mitigation as to the circumstances of the crime. (See Pen. Code, § 190.3, factor (a); *People v. Holmes* (2022) 12 Cal.5th 719, 753.) The record before us only establishes that some prospective jurors may have seen a portion of a "wire" during voir dire over a month before the penalty phase began. In light of this record, the unjustified shackling was harmless beyond a reasonable doubt notwithstanding the possibility that some panel members may have seen some form of restraint during jury selection.[6]

**B. *Guilt Phase Issues***

*1. Flight Instructions*

Based on defendant's flight from arresting officers, the court gave a consciousness of guilt instruction using a modified

---

[6]    If there is evidence outside of the appellate record that the jury's view of defendant's restraints was more extensive, a habeas corpus proceeding would allow evaluation of such evidence. (Cf. *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–268.)

version of CALJIC No. 2.52.[7] (See Pen. Code, § 1127c.) The defense asked for an instruction on the *absence* of flight to show he had no consciousness of guilt. It noted that defendant had agreed to police interviews in 1991 and 1992 even after he had become the focus of the investigation.[8] The trial court observed the defense could argue the point to the jury, but it would not give "a pinpoint instruction on a negative."

Defendant contends the court's refusal to instruct on the absence of flight deprived him of a fair trial. He argues the court's refusal, coupled with its instruction on flight, led to "disparate treatment of the parallel inferences to be drawn from a defendant's response to an accusation," which improperly favored the prosecution.

---

[7] The instruction stated here: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime *and has knowledge of the accusation*, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide." (Italics added.) The italicized language was added after discussion with counsel.

[8] The proposed instruction stated: "The absence of flight of a person immediately after the commission of a crime, or after he is accused of a crime, although the person had the opportunity to take flight, is a fact which may be considered by you in light of all other proven facts, in deciding whether or not the defendant's guilt has been proven beyond a reasonable doubt. The absence of flight may tend to show that the defendant did not have a consciousness of guilt and this fact alone may be sufficient to create a reasonable doubt as to defendant's guilt. The weight and significance of such circumstances are matters of [sic] the jury to determine."

We have previously rejected this argument in the context of admissibility. As *People v. Green* (1980) 27 Cal.3d 1 observed, evidence regarding absence of flight is generally not admissible. *People v. Montgomery* (1879) 53 Cal. 576 concluded the trial court did not err by excluding evidence that an in-custody defendant "had an opportunity to escape from the jail, but declined to avail himself of it." (*Id*. at p. 577.) *Montgomery* questioned whether an innocent inference could be made from the lack of escape, noting the defendant "may very naturally have been deterred from making an effort to escape from a fear that he would be recaptured, and that his fruitless attempt to escape would be evidence of guilt; or he may have felt so strong a confidence of his acquittal, for want of the requisite proof of his guilt, that he deemed it unnecessary to flee." (*Id*. at pp. 577–578.) *Green* clarified that "[t]he real issue here, however, is not whether this evidence is relevant but whether it should be excluded despite its relevance." (*Green*, at p. 38.) *Green* reasoned that such evidence presented "manifest risk of confusion and delay" and "the absence of flight is so ambiguous, so laden with conflicting interpretations, that its probative value on the issue of innocence is slight." (*Id*. at pp. 38–39; cf. *People v. Cowan* (2010) 50 Cal.4th 401, 473 [exclusion of evidence regarding the defendant's offer to speak to police proper].) *Green* concluded an instruction on the absence of flight was properly denied because "the instruction would have injected a new issue into the jury's deliberations and invited the kind of speculation that the *Montgomery* rule seeks to avoid." (*Green*, at p. 39.)

We affirmed *Green*'s reasoning in considering the question of instructions. *People v. Staten* (2000) 24 Cal.4th 434, rejected the argument that the defense had "a 'reciprocal' right to an

instruction on *absence* of flight, as showing lack of guilt." (*Id.* at p. 459.) *Staten* noted *Green* "observed that such an instruction would invite speculation; there are plausible reasons why a guilty person might refrain from flight. [Citation.] Our conclusion therein also forecloses any federal or state constitutional challenge based on due process." (*Ibid.*)

Defendant relies on *Cool v. United States* (1972) 409 U.S. 100, but that case only bolsters our conclusion. Cool was arrested along with her husband and one Robert Voyles. Voyles had tried to pass counterfeit bills at a local store while Cool and her husband waited outside. Cool testified in her own defense and also called Voyles as a witness. The latter admitted his guilt but insisted Cool and her husband were blameless. Over defense objection the court instructed in a way that clearly implied the jury "should disregard Voyles' testimony unless it was 'convinced it [was] true beyond a reasonable doubt.'" (*Id.* at p. 102.) The high court concluded such an instruction placed an improper burden on the defense when an accomplice gave *exculpatory* testimony because "the effect of the judge's instructions is to require the defendant to establish his *innocence* beyond a reasonable doubt." (*Id.* at p. 104.) *Cool* underscored that accomplice testimony used to *exonerate* a defendant should not be treated in the same way as testimony used to *implicate* her. Similarly, there are valid reasons to treat evidence of flight differently from the absence of flight. "[T]here is no fundamental unfairness in not requiring an instruction on the absence of flight . . . . [U]nlike the flight of an accused from the scene of a crime or after accusation of a crime, the absence of flight presents such marginal relevance it is usually not even admissible. (See *People v. Green, supra,* 27 Cal.3d at p. 37.) Since flight and the absence of flight are not on similar logical

or legal footings, the due process notions of fairness and parity . . . are inapplicable."[9] (*People v. Williams* (1997) 55 Cal.App.4th 648, 653; see *People v. McGowan* (2008) 160 Cal.App.4th 1099, 1105.)

### 2. *Third Party Culpability*

Defendant contends the trial court improperly excluded third party culpability evidence and precluded him from arguing that someone else committed the crimes here. There was no error.

### a. *Background*

The defense sought pretrial discovery of files from a federal drug trafficking investigation tangentially involving the victim's father, Luis Arroyo. Defense counsel explained the information was relevant to Luis's possible involvement in Laura's disappearance. The court warned that if the defense was pursuing a third party culpability theory, and "if you are seeking reports that are going to suggest that some other specific party is involved in the murder, I thought that had to be the basis of a noticed motion." After reviewing the Drug Enforcement Administration records in camera, the court

---

[9] Defendant's reliance on *Wardius v. Oregon* (1973) 412 U.S. 470 fails for similar reasons. *Wardius* held that due process principles precluded enforcement of a rule requiring defendants give notice of an alibi defense "unless reciprocal discovery rights are given to criminal defendants" (*id*. at p. 472), reasoning "[i]t is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State" (*id*. at p. 476). As discussed, however, evidence of flight does not stand on equal footing with evidence regarding absence of flight.

determined there was no relevant information pertaining to Mr. Arroyo and denied the request.

The court thereafter took evidence on the question of pretrial delay. (See discussion *ante*.) During that hearing, there was evidence that Luis Arroyo had completed a police investigative questionnaire. He listed as one of the "five most important causes that would have created this situation [involving Laura's case]" the sale of a family-owned taco shop to Guadalupe Echeverria. The defense also presented evidence of a letter sent by Echeverria's lawyer alleging the Arroyos had made misrepresentations about the sale. Echeverria died in December 1991. Detective Maxey testified he looked into the taco shop transaction but did not interview Echeverria.

At trial, Enrique Loa testified that he had seen a small brown car with several occupants parked in the cul-de-sac around 8:45 to 9:00 p.m. on the night of Laura's disappearance. Loa's sister, Teresa Thomas, testified Loa told her that night he had seen a brown Datsun with three men and a woman inside and that the occupants "squatted down to hide." Thomas then saw the car and occupants from her balcony. Robert Vazquez, who was with Loa that night, told police that he had seen a reddish-brown car parked in the cul-de-sac, describing the occupants as a Filipino man, two Filipino women in their thirties, and a Filipino woman "about 50 to 60." The victim's mother informed police that some friends told her that they had seen a small brown car with three men and a woman parked in the cul-de-sac between 8:50 and 9:00 p.m. On cross-examination, Mrs. Arroyo testified she did not remember hearing about a Datsun with four occupants or telling the police she suspected "a female from the taco shop" might have been involved in Laura's disappearance.

During cross-examination of Detective Maxey, defense counsel asked whether police investigated the Arroyos' possible involvement in drug activity. The court sustained three prosecution objections on relevance grounds. The questioning then turned to the taco shop sale. Maxey testified that both the person who sold the shop to the Arroyos and a subsequent purchaser were "unhappy with Mr. Arroyo." The court excluded, as calling for hearsay, questions about Luis's questionnaire responses, the attorney letter to the Arroyos, and the name of another person involved in the sale. When defense counsel began to ask whether Luis had received threats at his workplace, the prosecutor asked for a sidebar. The prosecutor objected "to apparently all these lines of questioning having to do with third-party culpability and trying to get it in through hearsay." The court suggested the admissibility of such evidence should have been raised in a noticed, pretrial motion. When defense counsel insisted she was not eliciting the evidence for its truth but only to raise doubts regarding the thoroughness of the police investigation, the court questioned the relevance of the evidence and concluded "when I see something like this, I'll go ahead and make sure that it doesn't get to the panel." When cross-examination resumed, defense counsel pursued a different line of questioning.

### b. *There Was No Error*

Defendant cannot demonstrate error on this record. Initially, although defendant suggests the court "cut off the defense from fully developing" his eschewed third party culpability theory, he makes no effort to identify what specific evidence the court precluded. Through cross-examination of prosecution witnesses, the defense elicited that a car with up to four occupants had been seen parked in the cul-de-sac at the

time of Laura's disappearance. Defense counsel asked Detective Maxey whether he investigated the taco shop sale as a possible motive for the crimes here. Although the court sustained hearsay objections to the contents of an attorney letter about the sale, defendant makes no argument here that a hearsay exception applied or that the letter itself was otherwise admissible.

Further, there was no basis for admitting the taco shop evidence. The defense theory appears to have been that Echeverria was a disgruntled purchaser and that an older passenger in a "suspicious" car parked in the vicinity was a woman. Whatever evidence supported this theory would have shown "mere motive or opportunity to commit the crime in another person" without providing any "direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People v. Hall* (1986) 41 Cal.3d 826, 833.) "We have repeatedly upheld the exclusion of third party culpability evidence when the third party's link to a crime is tenuous or speculative." (*People v. Turner* (2020) 10 Cal.5th 786, 817 (*Turner*).) As we explained in *Turner*, "admissible evidence of this nature points to the culpability of a *specific* third party, not the possibility that some unidentified third party could have committed the crime. [Citations.] For the evidence to be relevant and admissible, 'there must be *direct* or *circumstantial evidence linking the third person to the actual perpetration of the crime.*' " (*Id.* at pp. 816–817.) Defendant's argument here fails because there is no evidence linking the brown car's occupants, whoever they were, to the abduction of Laura, or with Echeverria for that matter. (See *People v. Kaurish* (1990) 52 Cal.3d 648, 685.) Defendant's third party evidence argument rests on two layers of speculation: 1. That Echeverria was one

of the occupants of a car seen parked near the kidnapping scene, and 2. that those occupants had something to do with Laura's disappearance. (See *Turner*, at pp. 817–818; *People v. Ghobrial* (2018) 5 Cal.5th 250, 283–284; *People v. Alcala* (1992) 4 Cal.4th 742, 792–793.) The state of the record defeats his claim.

## C. *Penalty Phase Issues*

### 1. *Victim Impact Evidence*

Defendant contends the trial court improperly allowed victim impact testimony from Laura's third grade teacher, Mari Peterson. There was no error.

### a. *Background*

Before the penalty phase, the parties discussed the prosecutor's intent to offer the video of a conversation between Laura and her teacher. Defense counsel noted that the teacher was on the prosecution's witness list and inquired whether she would merely authenticate the video or give victim impact testimony. The prosecutor clarified that the teacher would testify about the "impact of Laura's death on her, friends, and community. Her little friends and community." The defense objected to the presentation of victim impact testimony from someone outside the victim's family, and the parties discussed relevant case authority. The trial court overruled the objection but clarified that the teacher would only be allowed to discuss the impact of Laura's death in the days immediately following the murder, excluding evidence that Laura's classmates purchased a plaque in her honor two or three years later.

Mari Peterson testified she was Laura's third grade teacher in 1991 and knew Laura "very well." Laura was Peterson's "favorite student that year" and "was the type of student that from the time you met her, you just wanted to love

her." Laura "loved school," was "best friends with everybody," and would welcome new students. Peterson described the atmosphere at school the morning after Laura disappeared. Her father was passing out flyers and concerned parents were asking questions. Half the students "were crying already" and "wanted to know where their friend was." When Laura's body was discovered later that morning, Peterson and a psychologist broke the news to the students. Peterson described the impact on Laura's classmates: "Of course, they are not going to work. All they want to do is they want to know things. They want to know where she is. They want her back. Everybody wanted to sit at her desk. It was terrible." After Laura's death, parents began walking their children to and from school. Many children attended Laura's funeral, which "was packed," and Peterson described how Laura's body was in a "tiny little casket" with a teddy bear. At the burial there were "just so many kids crying." After Laura's death, Peterson was unable to teach third grade again. She felt guilty for missing the last day Laura attended class. Peterson identified Laura's class photo and a clip of the video conversation with Laura.

### b. *There Was No Error*

Defendant contends Peterson's testimony constituted "an inflammatory appeal to the raw sentiments of the jurors that went well beyond" permissible victim impact evidence, and the probative value of the evidence was substantially outweighed by the probability of undue prejudice. We reject these claims. "The Eighth Amendment does not categorically bar victim impact evidence. [Citation.] To the contrary, witnesses are permitted to share with jurors the harm that a capital crime caused in their lives." (*People v. Perez* (2018) 4 Cal.5th 421, 461–462.) "That is because 'the effects of a capital crime are relevant . . .

33

as a circumstance of the crime.' [Citations.] And so long as victim impact evidence does not invite the jury to respond in a purely irrational way, it is admissible." (*People v. Mendez* (2019) 7 Cal.5th 680, 712.) "Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." (*Payne v. Tennessee* (1991) 501 U.S. 808, 825.) " ' "Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones *and the community* is relevant and admissible as a circumstance of the crime under section 190.3, factor (a)." [Citation.] "The federal Constitution bars victim impact evidence only if it is 'so unduly prejudicial' as to render the trial 'fundamentally unfair.' " [Citation.]' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 729, italics added (*Westerfield*).)

*Westerfield* recently endorsed similar victim impact testimony from teachers "regarding [the victim's] character and contributions, and to the effect of her murder on themselves and [her] classmates." (*Westerfield, supra,* 6 Cal.5th at p. 728.) *Westerfield* reasoned: " 'The purpose of victim impact evidence is to demonstrate the immediate harm caused by the defendant's criminal conduct.' [Citation.] That harm is not limited to immediate family members. [Citation.] Friends, coworkers, classmates, and teachers, may all be affected by the death of the victim under the specific circumstances of a case. [Citations.] Here, defendant's shocking abduction and murder of seven-year-old Danielle caused emotional harm to her teachers and classmates. Our review of the record does not persuade us that her teachers' testimony regarding Danielle and those effects would invite a purely irrational response from the

jury or that it rendered defendant's trial fundamentally unfair under the circumstances." (*Id*. at p. 729.)

*Westerfield*'s reasoning applies equally here. Laura was very close to her teacher and classmates. The impact of her death on this community was relevant to assessing the harm defendant caused. "Moreover, we have repeatedly held that evidence related to a murder victim's funeral is relevant and admissible." (*People v. Winbush* (2017) 2 Cal.5th 402, 465.) Peterson's descriptions of the funeral and burial were not so emotional as to elicit a purely irrational response from the jury. (See *ibid*. [testimony regarding victim's funeral and family's grave visits proper]; *People v. Brady* (2010) 50 Cal.4th 547, 579–581 [videotape of victim's funeral properly admitted]; see also *People v. Dykes* (2009) 46 Cal.4th 731, 780, 782; *People v. Verdugo* (2010) 50 Cal.4th 263, 296–298.)

### 2. *Constitutionality of the Death Penalty Statute*

Defendant raises numerous familiar challenges to the constitutionality of California's death penalty scheme. His primary contention is that, when the jury returns a death verdict, it must conclude beyond a reasonable doubt that the aggravating factors outweigh the mitigating ones, because such a finding increases punishment. Proof of that nature is not required. As we have previously stated, "the only burden of proof applicable at the penalty phase" involves proof of the commission or conviction of other crimes under Penal Code section 190.3 factors (b) and (c). (*People v. Capers* (2019) 7 Cal.5th 989, 1015 (*Capers*).) "Otherwise, our cases do not require that a burden of proof be applied to aggravating evidence." (*Ibid*.) "We have previously held that the death penalty is not unconstitutional ' " 'for failing to require proof

beyond a reasonable doubt that aggravating factors exist, outweigh the mitigating factors, and render death the appropriate punishment.' [Citation.]" ' [Citation.] We also have consistently held the death penalty does not constitute an increased sentence. [Citation.] And we have determined that these conclusions are unaltered by *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, *Blakely v. Washington* (2004) 542 U.S. 296, or *Cunningham v. California* (2007) 549 U.S. 270. [Citation.]" (*People v. Wilson* (2021) 11 Cal.5th 259, 317 (*Wilson*).) The jury's determination of the appropriate sentence within the statutorily specified options "is 'an inherently moral and normative function, and not a factual one amenable to burden of proof calculations' [citation], [and] the prosecution has no obligation to bear a burden of proof or persuasion [citation]. Nor does the federal Constitution require an instruction that life is the presumptive penalty." (*Turner*, *supra*, 10 Cal.5th at p. 828.)

Defendant relies upon *Hurst v. Florida* (2016) 577 U.S. 92, but we have explained that case "does not alter our conclusion under the federal Constitution or under the Sixth Amendment about the burden of proof or unanimity regarding aggravating circumstances, the weighing of aggravating and mitigating circumstances, or the ultimate penalty determination. [Citations.] And we have concluded that *Hurst* does not cause us to reconsider our holdings that imposition of the death penalty does not constitute an increased sentence within the meaning of *Apprendi*[ *v. Arizona*]*, supra,* 530 U.S. 466, or that the imposition of the death penalty does not require factual findings within the meaning of *Ring v. Arizona*[*, supra,*] 536 U.S. 584. [Citation.] As [defendant] acknowledges, neither *Ring* nor *Hurst* decided the standard of proof that applies to the

ultimate weighing consideration." (*People v. McDaniel* (2021) 12 Cal.5th 97, 155−156.)

Likewise, *Rauf v. State* (Del. 2016) 145 A.3d 430, cited by defendant, does not call our prior decisions into doubt. The Delaware statute at issue there, like the Florida statute in *Hurst*, required *the trial court*, rather than the jury, to engage in additional factfinding before it determined whether death was the appropriate sentence. Under that statutory approach, the jury's findings were merely recommendations. (See Del. Code Ann. tit. 11, § 4209(d).)[10]  As we have noted with respect to *Hurst*, "[t]he California sentencing scheme is materially different from that in Florida, which, in contrast to our death penalty statutes, mandates that the trial court *alone* must find that sufficient aggravating circumstances outweigh the mitigating circumstances." (*Capers, supra,* 7 Cal.5th at p. 1014.)

---

**10**    The Delaware statute states in part that "the Court, after considering the findings and recommendation of the jury and without hearing or reviewing any additional evidence, shall impose a sentence of death if the Court finds by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that the aggravating circumstances found by the Court to exist outweigh the mitigating circumstances found by the Court to exist.  The jury's recommendation concerning whether the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist shall be given such consideration as deemed appropriate by the Court in light of the particular circumstances or details of the commission of the offense and the character and propensities of the offender as found to exist by the Court.  The jury's recommendation shall not be binding upon the Court." (Del. Code Ann. tit. 11, § 4209(d)(1).)

The same is true with respect to the Delaware statute at issue in *Rauf*.

In addition to his primary claim, defendant summarily asserts other challenges to the death penalty statute and related instructions that we have previously rejected. He does so "in order to urge reconsideration and to preserve these claims for federal review," but he presents no compelling argument to reconsider our precedents. We reject these claims as follows:

1. The death penalty statute is not impermissibly overbroad. It adequately narrows the class of defendants eligible for a death sentence. (*Wilson, supra,* 11 Cal.5th at p. 317; *People v. Chhoun* (2021) 11 Cal.5th 1, 53 (*Chhoun*); *Bell, supra,* 7 Cal.5th at p. 130; *Westerfield, supra,* 6 Cal.5th at p. 733.)

2. Penal Code section 190.3, factor (a), which directs the jury to consider the "circumstances of the crime," is not overbroad. (See *People v. Scully* (2021) 11 Cal.5th 542, 610 (*Scully*); *Wilson, supra,* 11 Cal.5th at p. 317; *Chhoun, supra,* 11 Cal.5th at p. 54; *Bell, supra,* 7 Cal.5th at p. 130.)

3. The prosecution did not bear the burden of persuasion regarding proof of any aggravating factor, the weighing of aggravating and mitigating factors, or imposition of the death penalty. There was also no requirement to instruct the jury regarding the lack of a burden of proof. (*Wilson, supra,* 11 Cal.5th at p. 317; *Chhoun, supra,* 11 Cal.5th at p. 54; *Bell, supra,* 7 Cal.5th at p. 131.)

4. The jury need not find individual aggravating factors unanimously. (*Wilson, supra,* 11 Cal.5th at p. 317; *Chhoun, supra,* 11 Cal.5th at p. 54; *Westerfield, supra,* 6 Cal.5th at p. 733.)

5. An instruction that the jury should determine whether "the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole" was not impermissibly vague. (See *Scully, supra,* 11 Cal.5th at p. 609; *Wilson, supra,* 11 Cal.5th at p. 318.)

6. CALJIC No. 8.88 is not unconstitutional for directing the jury to determine whether the aggravating circumstances "warrant" death rather than that the death penalty is "appropriate," or for failing to expressly state that the jury should return a life sentence if it finds mitigating circumstances outweigh aggravating ones. (*Wilson, supra,* 11 Cal.5th at p. 318; *Chhoun, supra,* 11 Cal.5th at p. 54; *People v. Morales* (2020) 10 Cal.5th 76, 112.)

7. There is no presumption in favor of a life term. (*Wilson, supra,* 11 Cal.5th at pp. 317–318; *Chhoun, supra,* 11 Cal.5th at p. 54; *People v. Ramirez* (2021) 10 Cal.5th 983, 1039 (*Ramirez*).)

8. The jury need not make written findings. (*Wilson, supra,* 11 Cal.5th at p. 317; *Chhoun, supra,* 11 Cal.5th at p. 54; *Bell, supra,* 7 Cal.5th at p. 131.)

9. The use of adjectives "extreme" and "substantial" do not improperly limit the jury's consideration of certain mitigating factors. (*Wilson, supra,* 11 Cal.5th at p. 318; *Chhoun, supra,* 11 Cal.5th at p. 55; *Bell, supra,* 7 Cal.5th at p. 130.)

10. There was no requirement that inapplicable sentencing factors be deleted. (*People v. Dworak* (2021) 11 Cal.5th 881, 917; *Wilson, supra,* 11 Cal.5th at p. 318; *Chhoun, supra,* 11 Cal.5th at p. 55.)

11. There was no requirement to identify factors that were only mitigating. (*Chhoun, supra,* 11 Cal.5th at p. 55; *Ramirez, supra,* 10 Cal.5th at p. 1040; *Bell, supra,* 7 Cal.5th at p. 130.)

12. Intercase proportionality review is not constitutionally required. (*Wilson, supra,* 11 Cal.5th at p. 318; *Chhoun, supra,* 11 Cal.5th at p. 55; *Bell, supra,* 7 Cal.5th at p. 131; *Westerfield, supra,* 6 Cal.5th at p. 734.)

13. The death penalty scheme does not violate equal protection principles "by providing significantly fewer procedural protections for persons facing a death sentence than are afforded persons charged with noncapital crimes." (*Wilson, supra,* 11 Cal.5th at p. 318; *Chhoun, supra,* 11 Cal.5th at p. 55; *Bell, supra,* 7 Cal.5th at p. 131.)

14. The death penalty is not a "regular" punishment that violates international norms. (*Wilson, supra,* 11 Cal.5th at p. 318; *Chhoun, supra,* 11 Cal.5th at p. 55; *Bell, supra,* 7 Cal.5th at pp. 131–132.)

## D. *Cumulative Error Claim*

Defendant contends cumulative error deprived him of a fair trial. The only potential error identified was defendant's shackling, for which he failed to establish prejudice. Therefore, there is no reversable error to accumulate. (*Bell, supra,* 7 Cal.5th at p. 132; *Westerfield, supra,* 6 Cal.5th at p. 728.)

## III. DISPOSITION

The judgment is affirmed.

**CORRIGAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**MENETREZ, J.\***

---

\*    Associate Justice of the Court of Appeal, Fourth Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Bracamontes

———————————————————————————————————

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

———————————————————————————————————

**Opinion No.** S139702
**Date Filed:** April 11, 2022

———————————————————————————————————

**Court:**  Superior
**County:**  San Diego
**Judge:**  John M. Thompson

———————————————————————————————————

**Counsel:**

Mary K. McComb, State Public Defender, under appointment by the Supreme Court, and AJ Kutchins, Deputy State Public Defender, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens, Theodore M. Cropley and Michael T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

AJ Kutchins
Deputy State Public Defender
1111 Broadway, Suite 1000
Oakland, CA 94607
(510) 267-3300

Michael T. Murphy
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9211