Filed 9/16/22  P. v. Smith CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B309606 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA152190) |
| v. | |
| MICHAEL SMITH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Henry J. Hall, Judge.  Affirmed.

Daniel Milchiker, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Marc A. Kohm and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

A jury convicted Michael Smith of two counts of assault with a deadly weapon in violation of Penal Code[1] section 245, subdivision (a)(1). The trial court imposed a sentence of 20 years in state prison. On appeal, Smith contends the court erred in denying his motion to represent himself at the preliminary hearing and trial; in presenting him to the jury shackled, in jail garb, and on a gurney; and in excluding him from the courtroom at various points during his trial. We reject each of those contentions, and therefore affirm.

**BACKGROUND**

Following a June 2020 altercation at the board and care facility where Smith resided, the People charged him with two counts of assault with a deadly weapon. The People further alleged Smith had suffered three prior strikes. (§§ 667, subds. (a)(1), (d), 1170.12.) The evidence at trial established that Smith threatened to kill the owner of the board and care facility while holding a knife. He then used the knife to slash the chest of another elderly resident who intervened. On appeal, Smith raises no issues requiring a detailed exposition of the facts of the case. We therefore turn to the relevant procedural history.

Smith was arrested on June 9, 2020. On June 10, he appeared for arraignment, represented by appointed counsel. As discussed in more detail below, before and during the early stages of trial, the sheriff's department required that Smith sit on a gurney while being transported and while attending court proceedings, due to his weight. Smith was estimated to weigh between 400 and 600 pounds.

_____

[1] All further undesignated statutory references are to the Penal Code.

2

On July 16, the matter was called for a preliminary hearing and a different attorney appeared on Smith's behalf. Smith was not present because he had refused to be transported to court. The court signed an extraction order and continued the case to the next day.

On July 17, the parties appeared for the preliminary hearing. Smith was present on a gurney, represented by the attorney who had appeared on his behalf the day before. The proceeding began with a discussion of the statutory deadlines for the preliminary hearing. Before the court could utter a complete sentence, Smith interjected to assert his speedy trial rights. As the preliminary hearing discussion continued, Smith again cut the court off, stating; "Motion to dismiss . . . for discrimination under the color of authority under the law."

The court repeatedly requested that Smith "hold on," but he ignored the court and continued:

"The Court: Okay. Well—

"The Defendant: I was not arraigned, and then the court decided that it didn't want to hear me without a lawyer, and I asked for subligation [*sic*]—the reason for subligation. I'm not a slave to no man. I didn't hire no lawyer. They wouldn't even— they buried me in prison. They wouldn't even allow me to have a pencil and paper, my telephone, or a telephone call. They wouldn't let me have it for three days. They didn't even give me toilet paper for five days, and they didn't give me soap until six days later. I was not in the position—they took the evidence I had and cut it up and stole it in front of me, Your Honor.

"The Court: Well, Mr. Smith, hold on. We are going to get the—

"The Defendant:  I was doing an investigation, and they come in and arrest me because the thieves and the murders that I was investigating lied on me."

The court responded that they would "get to the bottom of it," and returned to the arraignment date and speedy trial calculation, only to have Smith break in:

"The Defendant:  It was no legal arraignment, Your Honor. The court told me under—that I had no voice.

"The Court:  Mr. Smith—

"The Defendant:  And then when I tried to call the defender's office, the phone would not work.  It says not authorized."

The court warned Smith that if he did not stop disrupting the proceedings he would be removed from the courtroom.  The court further told Smith he would have "more than an ample opportunity to get whatever it is you have to get off your chest off your chest," but the proceedings needed to happen in an orderly way.  Smith said he understood.  Yet, as soon as the court began speaking again, Smith interrupted, demanding a jury trial.  The court informed him that they had not yet arrived at that topic.

The court and counsel set a further date for the preliminary hearing, then the court explained Smith's jury trial rights and what would transpire at the preliminary hearing.  When defense counsel indicated he would not pursue a motion to suppress at the preliminary hearing, Smith interjected:

"The Defendant:  I want to limit on me all of the evidence that was collected after June the 8th, because on June the 8th, the—it's insufficient evidence that I did anything.

"[Defense counsel]:  Okay.

4

"The Court: Okay. We're going to—that's what we are going to find out.

"The Defendant: And I got plenty of evidence that they collected that they had been murdering people; they had been stealing from people; and they had been putting people in jail for no reason at all.

"The Court: Well, we are going to find that out. And, believe me, Mr. Smith, if it looks to me like they put you in jail for no reason at all, you are going home. Okay? But we have to do this in a legal orderly way. And in order to do that, I've got to hear what the People present at this preliminary hearing. That's what the hearing is to determine, whether there's enough evidence for the case to go forward. So let's do this in an organized legal way."

The court again attempted to finalize the preliminary hearing arrangements. Smith interrupted the court and counsel, stating, "Objection," "I need to know," and "I have the flight risk of 1, and then they pushed it up to 15 for no reason at all." As the court provided a start time for the preliminary hearing and began to inquire about having Smith transported to court, Smith interrupted again:

"The Defendant: This is white supremacy racism.

"The Court: Mr. Smith, believe me, we will not allow that to happen. Okay?

"The Defendant: Well, this is what's happening, white supremacy racism.

"The Court: Let me see what's going on—

"The Defendant: Discrimination under the color of the law.

"The Court: Okay. We are done for now. We will see everybody back here, then, Tuesday morning and get started as soon as possible."

At the beginning of the next hearing on July 21, Smith immediately asserted that appointed counsel was not his attorney, he had not accepted the lawyer, and he had not spoken with him. When the court explained that it had appointed the public defender's office to represent him, Smith declared, "Pro per. You cannot by law give me a lawyer that I don't want." When the court began to explain that it could, in fact, assign the public defender's office to represent him, Smith interrupted, "I don't believe you. Show me where—"

The court warned Smith that, although it had tolerated his disruptions at the prior appearance, it would only allow him to stay as long as he could maintain proper decorum in court. Smith responded, "If he's my lawyer—I fire you." The court stated it seemed necessary to clear the courtroom to conduct a *Marsden* hearing.[2] Defense counsel asked for a moment to speak with Smith, but as counsel and the court tried to discuss the logistics of providing Smith and his attorney a private area to communicate, Smith apparently continued to speak, leading the court to admonish him, "Mr. Smith, I'm trying to talk to your lawyer. Would you please be quiet?" Smith responded that counsel was not his lawyer because he had just fired him. Eventually the judge left the bench so that Smith and counsel could confer.

When the proceedings resumed, defense counsel informed the court that Smith wished to represent himself. The court

_____

[2] *People v. Marsden* (1970) 2 Cal.3d 118.

6

denied the request, reasoning that Smith had been "way too disruptive" and that the court was "close to having a 1368 doubt."[3]  Smith objected, to which the court responded, "You can object all you want to, Mr. Smith, but this kind of disruptive behavior is unacceptable and it would disqualify you in my opinion from representing yourself.  We'll see how things go."  Smith answered, "You are prejudiced and you would like to see the defendant go to prison for the rest of his life.  Therefore, I accuse you of prejudice towards the defendant."  The court reminded Smith that it would remove him from the courtroom if he could not maintain "some level of decorum."

The preliminary hearing was completed the same day.  After Smith was held to answer on the two charges, he tried to get off the gurney and continued to address the court regarding legal matters despite instructions to let his attorney speak for him.  He reasserted his desire to go pro per, so that he could "go home and take care of—of this case because there's a lot of things that I know about the case that the attorney cannot know."  The court indicated it would not discuss Smith's case without his attorney being present.

Smith was arraigned on August 4, 2020.  He again refused to be transported to court for a pretrial appearance on September 3.  The court ordered that he be extracted for the next appearance.  As soon as the proceedings began on September 10, Smith interrupted to assert that the statute of limitations had run on his case.  When instructed to let his attorney speak for him, he insisted he had fired defense counsel.  After repeatedly

---

[3] Section 1368 sets forth the procedure for further inquiry when a doubt arises as to a criminal defendant's mental competence.

asking Smith to "stop for a minute," and "stop," the court cleared the courtroom to conduct a *Marsden* hearing.

At the outset of the hearing, the court warned Smith that he would be excluded if he could not remain quiet when told to do so. Smith explained that his attorney had never visited him to discuss the case. Defense counsel corroborated that pandemic safety concerns had rendered him unable to visit Smith in person. Counsel further admitted that his office had no measures in place to visit clients who could not medically attend videoconferences. Defense counsel indicated he had planned to meet with Smith that day, suggesting the meeting could occur in the courtroom if the court was willing to clear it for that purpose. Smith continued to interrupt. He asserted he had read the law, he discussed one of his prior criminal cases, and he repeatedly asserted that "martial law" was in effect. The court began to speak, stating it would allow time for Smith and counsel to meet and discuss the case in the courtroom. Before the court could finish, Smith again interrupted, reasserting that the statute of limitations had passed and that he had filed a motion to recuse the court. The court responded:

"The Court: I'll consider it when I get it. I haven't seen it.
"The Defendant: Here it is right here.
"The Court: Well, it hasn't been filed. . . .
"The Defendant: It has.
"The Court: Mr. Smith—
"The Defendant: It says—
"The Court: Mr. Smith—
"The Defendant: I—

"The Court: Mr. Smith, I've been trying to treat you like an adult with some respect. If you don't stop talking over me we are done. Are we clear?"

Smith denied that he was talking over the court. As the court began to make its ruling, Smith interjected, insisting he had fired defense counsel and the court did not have the power to force him to have an attorney. The court explained:

"The Court: Mr. Smith, the only thing that would relieve you of that is if I allowed you to go pro per. And you're the most disruptive defendant—

"The Defendant: I am pro per. My name is Michael Smith. My mother and father give me this name, Michael Smith. The doctor of—agreed with my mother and father that I should be Michael Smith. The state has always notified me as Michael Smith. Now, how do I come in and you going to tell me that I'm not Michael Smith? This is my proper name.

"The Court: Mr. Smith—

"The Defendant: Michael Smith. And pro per proper means the same thing."

The court stated it was close to declaring a doubt about Smith's competency. Defense counsel disagreed, indicating he believed Smith understood the nature of the proceedings, but merely had his own ideas about the representation. The court denied the *Marsden* and self-representation requests, citing Smith's disruptiveness. Smith continued to interrupt the proceedings to object and assert his speedy trial rights.

On September 16, the day before jury selection, the parties appeared in court to discuss pretrial motions. The court noted that Smith remained confined to a gurney and that he had tried to sit up several times during prior proceedings. The court

explained that this was "very dangerous to [Smith] and very dangerous to people in the courtroom." The court instructed Smith that if he either attempted to sit up or flinch in a manner the court deemed threatening or dangerous, it would order him strapped to the gurney so that he could not move. The court further explained that this was for Smith's safety, and for the safety of the people in the courtroom.

The court then asked if defense counsel had civilian clothing for Smith. Counsel said he would try to obtain some by the next day. The court suggested that a blanket could be used to cover Smith's lower extremities if clothing could not be located. Finally, the court advised that social distancing protocols in place due to the COVID-19 pandemic affected the physical location of the participants, and all parties, including Smith, should be on their best behavior to ensure a smooth trial process.

Voir dire began on September 17. Smith again appeared on a gurney. Before the first group of prospective jurors was brought into the courtroom, defense counsel informed the court that he had been unable to secure civilian clothing that fit Smith. The court noted Smith was expressly demanding a speedy trial, and obtaining civilian clothing was a defense responsibility. Thus, while the court found the situation unfortunate, trial would proceed. Defense counsel further reported that Smith told him his civilian clothing "on the outside" had been destroyed.

During each round of voir dire, the court instructed prospective jurors—in one case twice—to disregard that Smith was in a gurney, that it was not evidence in the case, and that it was a non-fact for the jury. Additionally, each group of jurors was questioned in some manner about their ability to disregard the gurney and to decide the case based on the evidence only. At

the end of the first day's proceedings, in the presence of the first group of prospective jurors, Smith commented that the proceedings were illegal and criticized the judge.[4]

On September 18, Smith appeared before a new panel of prospective jurors. Before the jurors entered the courtroom, the court warned Smith that any disruption would result in his removal for the duration of the trial. The court further cautioned Smith that disruptive behavior would not help him, noting that at one point in the proceedings, his conduct had required the presence of eight deputies in the courtroom. After the prospective jurors entered the courtroom, Smith said the gurney was positioned in a manner that prevented him from seeing them. He demanded that he be turned around, then claimed he was being assaulted. Although defense counsel told Smith he could be turned to face the jurors, he nonetheless became more agitated, complaining, with profanity, that the proceeding was illegal. The court ordered that Smith be removed from the courtroom. The court then instructed the jury to disregard Smith's removal and reminded them to judge the case based upon the evidence alone.

As jury selection continued on September 21, defense counsel objected to Smith being strapped to the gurney. Smith was restrained by four straps that were placed over his knees,

---

[4] Smith's comments were made aloud while the court and counsel had a brief, unreported conference at side bar on a scheduling issue. Smith stated, "This is an illegal procedure. Under martial law still in effect? I mean, this is a [sic] illegal procedure. Civil law has been suspended. Martial law takes effect. And the judge is the one doing that. Henry the other? Who is he?"

thighs, chest, and one across his chest, similar to a seat belt. Defense counsel argued there had been no showing of necessity and the straps were very uncomfortable. The court responded that the straps were necessary to protect Smith from rolling himself off the gurney, as had occurred several times, both in the back hallway, and in the courtroom. Smith had also taken off the "seatbelt" and nearly hit a couple of jurors with it in the process.

Defense counsel suggested putting a blanket over Smith, to which the court assented. While the parties were waiting for the blanket, Smith asked to sit in the wheelchair that had been present throughout the proceedings. The court stated it was concerned because there was a medical directive indicating Smith needed to be on a gurney. However, the court also stated that it would contact the head doctor at the county jail to determine if Smith could attend trial in the wheelchair.

Smith informed the court that the gurney was very uncomfortable because it forced his feet to dangle and the straps were painful. The court asked defense counsel for suggestions as to how to proceed, noting the court had a medical order requiring a gurney. Defense counsel asked the court to order a larger gurney. The court responded that a larger gurney was used the week before and "everybody" wanted a smaller gurney so that there would be fewer paramedics in the courtroom. Defense counsel stated he had not been involved in that conversation, but pointed out the inadequate size of the gurney, leading the court to again indicate it would contact the medical authorities later that day to resolve the issue. The court stated that if Smith needed a larger gurney, it would be ordered.

Smith added that he had almost been dropped on his head during one attempt to lift the small gurney, and only the straps

12

prevented him from being injured. The court responded that there were orders from the jail medical authorities that Smith be in a gurney, and the court would not contravene those orders. The court explained it had specifically communicated with medical authorities the week before regarding the medical directive, and was informed the gurney was necessary for Smith's safety and the safety of the courtroom. However, the court repeated that it would contact the jail medical authorities later that day to try to resolve the issues.

On September 22, the last day of jury selection, Smith refused to leave his cell for court. Ten deputies were required to extract him from his cell, delaying the proceedings. Once Smith arrived, the court indicated it had been informed that the gurney was only necessary for transportation, and Smith was permitted to attend trial in a wheelchair. Although the sheriff's department requested that Smith remain in a gurney due to his behavior that morning, the court stated it would permit him to remain in a wheelchair, provided that his obstructive behavior did not continue. Defense counsel noted "for the record," that Smith's left hand remained cuffed to the wheelchair. The court indicated, interrupted by Smith's objections, that it would allow the handcuff due to Smith's history of violence, his size, and his prior threats to roll off the gurney.

Shortly thereafter, Smith interrupted the proceedings, in the prospective jurors' presence, claiming he had fired his attorney and demanding that the entire panel of jurors be excused. The court admonished Smith, but he continued, asserting that "a Ku Klux Klan member who hates blacks" was in the jury pool. The court ordered Smith removed from the courtroom. The court instructed the prospective jurors that the

13

outburst was not evidence, and that the evidence to try the case would come from the witness stand and the physical evidence in court. Smith was absent for opening statements and much of the complainant's testimony. However, the court directed the bailiff to place Smith in a room where the audio of the proceedings was transmitted by speaker.

On September 23, the court again warned Smith about his behavior and the possibility he could again be removed from the courtroom. On September 24, the third day of trial testimony, the court ordered Smith removed after he accused the court of being racist and prejudiced against him, insisted he had recused the judge, asserted the court had no authority to preside over the trial, and ignored the court's requests that he stop talking. Smith was then absent for the discussion of jury instructions. During that discussion, the court noted there was no indication the jury saw that Smith was handcuffed. Still, the court granted the defense request to include CALCRIM No. 204 in the jury instructions.[5]

On September 25, Smith said he wished to testify, but he refused to take the witness oath. In the jury's presence, Smith demanded a trial by judge rather than jury, and claimed the charges were illegal because the statute of limitations had expired, and the charges were dismissed. The court excused the jurors and began to explain the statute of limitations to Smith.

---

[5] This instruction provided: "The fact that physical restraints have been placed on the defendant is not evidence. Do not speculate about the reason. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it for any purpose or discuss it during your deliberations."

Smith interrupted, arguing about the statute of limitations, the denial of his right to self-representation, his right to a bench trial, and his attorney's handling of the case. The court again warned Smith that it would exclude him if he continued to have outbursts.[6] As soon as the proceedings resumed, and in the presence of the jury, Smith insisted he was his only defense, he had fired his attorney, and if he were removed the court would be removing the defense. The court ordered Smith removed from the courtroom. He was not present for either the court's instruction of the jury or closing arguments.

On September 28, the jury found Smith guilty of both counts of assault with a deadly weapon. In a bifurcated proceeding, the jury found true that Smith had suffered three prior convictions. The court sentenced Smith to an aggregate term of 20 years in state prison. Smith timely appealed.

---

[6] Before calling the jurors back in, the court stated, "This trial has now been going on for a little over a week. It's been my observation when Mr. Smith chooses he can behave appropriately in court. He behaved appropriately yesterday in front of the jury. He behaved appropriately Tuesday in front of the jury. When he chooses not to he engages in the kind of behavior that we've seen this morning. I don't know whether it is something intentional to try to force a mistrial or what it is." At that point, Smith interjected and launched into a series of profanity-laden allegations about being raped in jail. The court continued, "In any event, Mr. Smith has demonstrated an ability to behave appropriately. I think as [defense counsel] pointed out yesterday this is something that he chooses to do, not something that indicates an incompetence or inability to participate in the court proceedings. I think this is a choice on his part and that's what I'm finding for the record."

## DISCUSSION

## I.     Smith's self-representation requests

Smith asserts the trial court erred in denying his requests to represent himself before and after the preliminary hearing. We find no error.

The Sixth Amendment guarantees a criminal defendant the right to be represented by counsel at all critical stages of a criminal prosecution, but also the right to "proceed *without* counsel when" he "voluntarily and intelligently elects to do so." (*Faretta v. California* (1975) 422 U.S. 806, 807 (*Faretta*); *United States v. Wade* (1967) 388 U.S. 218, 223–227; *Gideon v. Wainwright* (1963) 372 U.S. 335, 339–345.) These rights apply at the preliminary hearing stage. (*Curry v. Superior Court* (1977) 75 Cal.App.3d 221, 229.)

However, "a *Faretta* motion may be denied if the defendant . . . is disruptive in the courtroom or engages in misconduct outside the courtroom that 'seriously threatens the core integrity of the trial' [citations], or the motion is made for purpose of delay." (*People v. Lynch* (2010) 50 Cal.4th 693, 721–722.) "This rule is obviously critical to the viable functioning of the courtroom. A constantly disruptive defendant who represents himself, and who therefore cannot be removed from the trial proceedings as a sanction against disruption, would have the capacity to bring his trial to a standstill." (*People v. Welch* (1999) 20 Cal.4th 701, 734 (*Welch*).)

When determining whether to deny or terminate self-representation based on a defendant's misconduct, the "trial court must . . . decid[e] whether a defendant is and will remain so disruptive, obstreperous, disobedient, disrespectful or obstructionist in his or her actions or words as to preclude the

16

exercise of the right to self-representation." (*Welch, supra,* 20 Cal.4th at p. 735; *McKaskle v. Wiggins* (1984) 465 U.S. 168, 173 [defendant must be "able and willing to abide by rules of procedure and courtroom protocol"]; *Faretta, supra,* 422 U.S. at p. 834, fn. 46 [misbehavior must constitute "abuse [of] the dignity of the courtroom"].) In making this determination, the court should consider "the nature of the misconduct and its impact on the trial proceedings," "the availability and suitability of alternative sanctions," "whether the defendant has been warned that particular misconduct will result in termination of in propria persona status," and whether the defendant "has 'intentionally sought to disrupt and delay his trial.' " (*People v. Carson* (2005) 35 Cal.4th 1, 9–10.)

On appeal, a reviewing court must "accord due deference to the trial court's assessment of the defendant's motives and sincerity as well as the nature and context of his misconduct and its impact on the integrity of the trial . . . [and the] fairness of the proceedings." (*People v. Carson, supra,* 35 Cal.4th at p. 12; accord *Welch, supra,* 20 Cal.4th at p. 735.) We review the trial court order for abuse of discretion, and will not disturb the exercise of that discretion absent " ' "a strong showing of clear abuse." ' " (*People v. Williams* (2013) 58 Cal.4th 197, 253 (*Williams*).)

There is no such strong showing of clear abuse in this case. Before the court denied Smith's first request for self-representation, Smith repeatedly engaged in disruptive behavior. He refused to be transported to court on July 16. At the July 17 proceeding, he interrupted the court, starting as soon as the court began speaking, and continuing throughout the proceeding. Although the court several times told Smith that his concerns

17

would be addressed, Smith persisted in interrupting to assert the same objections and concerns. On July 21, Smith continued his pattern of interjecting and talking over the court, even as the court attempted to make arrangements for him to speak with his attorney. He rejected the court's authority and interrupted when the court attempted to explain the court's process or the law. Smith clearly demonstrated his unwillingness to follow rules of procedure or courtroom protocol, and his abuse of the dignity of the courtroom.

The court's analysis in *Welch* is instructive. In *Welch*, the record showed defendant "belligerently denied awareness of a calendar date that was set in his presence; he turned his back on the trial court when addressing it; he interrupted the trial court several times to argue what the court had declared to be a nonmeritorious point; he accused the court of misleading him; he refused to allow the court to speak and he refused several times to follow the court's admonishment of silence." (*Welch*, *supra*, 20 Cal.4th at p. 735.) Our high court concluded the trial court did not abuse its discretion in denying the defendant's *Faretta* motion. The court explained that "while no single one of the above incidents may have been sufficient by itself to warrant a denial of the right of self-representation, taken together they amount to a reasonable basis for the trial court's conclusion that defendant could not or would not conform his conduct to the rules of procedure and courtroom protocol." (*Welch*, at p. 735.)

Similarly, in this case, Smith's pattern of conduct established his obstruction and refusal to conform to courtroom protocols. (*Welch*, *supra*, 20 Cal.4th at p. 735.) Like the defendant in *Welch*, Smith repeatedly refused to follow the court's admonishments to be silent, did not let the court speak, and

18

rejected the court's authority. We reject Smith's suggestion that the court should have granted his *Faretta* motion with a warning that disruptive conduct would result in revocation of his pro per status. Trial courts faced with requests for self-representation are required to *anticipate*, as the court did here, a defendant's conduct at trial based upon any disruptiveness in the existing proceedings. (*Welch*, at p. 773.) Smith had already displayed extremely disruptive conduct, and we find no abuse of discretion in the court's denial of the *Faretta* motion on that basis. (*Williams*, *supra*, 58 Cal.4th at p. 253).

To the extent that Smith challenges the court's subsequent denials of self-representation, his contentions lack merit. As Smith himself recognizes, he "unquestionably became more" disruptive as the proceedings continued. Each of his subsequent requests occurred after he had at least one serious outburst in front of the jury, during which he complained about being assaulted in the courtroom and, using profanity, declared the proceedings illegal. In other words, by the time the court denied each of these renewed requests for self-representation, Smith's ensuing conduct had only amplified that he would not adhere to courtroom protocol and that his conduct abused the dignity of the courtroom.

In sum, given Smith's disruptive, disrespectful conduct, and his failure to heed the court's many warnings, it was apparent from the very early stages of the case that he was obstructive and unwilling to abide by the rules of courtroom procedure and protocol. (*Welch*, *supra*, 20 Cal.4th at p. 735.) The court acted well within its discretion in concluding Smith's disruptive behavior would bring the trial "to a standstill" if he were representing himself. (*Welch*, at p. 734.) Smith has failed

to make out the " ' "strong showing of clear abuse" ' " required to warrant reversal.  (*Williams*, *supra*, 58 Cal.4th at p. 253.)

## II.    Smith's appearance at trial

Next, Smith contends that his presentation to the jury strapped on a gurney, handcuffed to a wheelchair, and in jail garb, constituted an abuse of discretion and otherwise violated his rights to due process, to a fair trial, and to participate in his defense.  We again disagree.

"The unjustified imposition of visible physical restraints violates a criminal defendant's right to due process under the Fifth and Fourteenth Amendments to the federal Constitution." (*People v. Hernandez* (2011) 51 Cal.4th 733, 745, italics omitted.) Restraints "like handcuffs . . . may erode the presumption of innocence because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community.  [Citations.]  The same problem arises if the defendant is required to appear before the jury dressed in prison clothing." (*People v. Stevens* (2009) 47 Cal.4th 625, 632–633 (*Stevens*); see *Estelle v. Williams* (1976) 425 U.S. 501, 518 (*Estelle*) [danger of denial of fair trial when defendant appears in prison garb].)

Nonetheless, "the 'court has broad power to maintain courtroom security and orderly proceedings.' (*People v. Hayes* (1999) 21 Cal.4th 1211, 1269.)  On appeal, its decisions on these matters are reviewed for abuse of discretion.  ([*Stevens, supra*, 47 Cal.4th at p. 633].)  Under California law, 'a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence unless there is a showing of a manifest need for such restraints.' (*People v. Duran* (1976) 16 Cal.3d 282, 290–291.)  Similarly, the federal 'Constitution

20

forbids the use of visible shackles . . . unless that use is "justified by an essential state interest"—such as the interest in courtroom security—specific to the defendant on trial.' (*Deck v. Missouri* (2005) 544 U.S. 622, 624, italics omitted.) . . . 'In deciding whether restraints are justified, the trial court may "take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." (*Deck v. Missouri, supra*, 544 U.S. at p. 629.) These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior.' (*People v. Gamache* (2010) 48 Cal.4th 347, 367.)" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1270–1271; accord *People v. Bracamontes* (2022) 12 Cal.5th 977, 991 (*Bracamontes*) [individualized assessment necessary because restraints are "extraordinary measures"].)

We find no abuse of discretion or constitutional error in the court's ruling requiring Smith to appear on a gurney with restraints during voir dire, and then with handcuffs on one hand for the remainder of trial. A medical directive justified the use of the gurney for several court appearances.[7] Indeed, not until defense counsel raised an objection on the third day of voir dire was the medical necessity of the gurney even questioned. Based on the facts before the court at the time, there was a "manifest

---

[7] In his reply brief, Smith questions for the first time the existence of the medical directive. This argument misconstrues the applicable burdens on appeal. Because it is the defendant's sole burden to provide a record showing error below, we presume the existence of the medical orders in the absence of contrary evidence. (*People v. Moore* (2021) 68 Cal.App.5th 856, 866.)

need" for the gurney.  (*People v. Duran*, *supra*, 16 Cal.3d at pp. 290–291.)

A similar manifest need was apparent with respect to the gurney's straps, and, later, the handcuffs.  Because of COVID-19 pandemic-related social distancing measures, Smith was necessarily placed close to several jurors, who were spaced throughout the courtroom instead of seated in the jury box.  He was so close that he nearly hit several of them when he attempted to remove the "seatbelt" strap.  He also had repeatedly tried to roll off the gurney, endangering himself and others in the courtroom.  As Smith himself recognized at one point, the gurney's straps were necessary to prevent his being seriously injured from a fall.  The record unequivocally demonstrates Smith's extreme safety risk based on his size, his history of threatening and assaultive conduct, his disruptive behavior throughout the proceedings, and his inability or unwillingness to follow the court's instructions.  (*Bracamontes*, *supra*, 12 Cal.5th at p. 992 [courts must assess totality of circumstances].)

Smith asserts that the trial court erred by failing to independently determine whether there was a manifest need for the restraints it imposed.  (*People v. Lomax* (2010) 49 Cal.4th 530, 559, 561 [court must exercise independent judgment, and may not rely solely on judgment of law enforcement or security personnel]; *People v. Mar* (2002) 28 Cal.4th 1201, 1218.)  We disagree.  Here, the court, on its own initiative, contacted jail medical authorities in advance of the trial to ensure that the gurney was necessary, and then did so again after the defense objected to the gurney.  When the jail medical authorities ultimately reversed their position, the court immediately permitted Smith to utilize his wheelchair.  The court properly

22

exercised its independent judgment under the facts of this particular case. It further imposed the least restrictive method of restraint at each stage of the proceedings. (*People v. Montes* (2014) 58 Cal.4th 809, 841.)

The record belies Smith's claim that the restraints were only imposed because he attempted to sit up, flinch or reposition himself. Instead, it reflects several instances in which Smith attempted to get off the gurney in an unsafe manner, and otherwise failed to comply with the court's instructions. Given this history, the trial court reasonably concluded there was a manifest need for the restraints and an essential state interest in protecting all of those present in the courthouse, including Smith himself, at each stage of the proceedings that restraints were imposed. (*Bracamontes*, *supra*, 12 Cal.5th at p. 992 [history of nonconforming courtroom behavior or threat of violence can justify restraint].)

We likewise find no merit in Smith's argument that the trial court erred in compelling him to wear jail clothing. The court did not compel Smith to wear jail garb. Instead, the court initiated the jail clothes discussion, leaving it up to defense counsel to locate clothing for Smith. After counsel discovered Smith's civilian clothing had been destroyed and he was unable to secure clothing that fit his client, the court deemed the situation unfortunate, but stated that finding clothing was a defense responsibility. There was no further discussion of the matter, other than when the defense took the court up on its offer to put a blanket over Smith the next day. Rather than compelling Smith wear jail clothing, the court went beyond its obligations to minimize any prejudice to Smith. (*People v.*

*Williams* (1991) 228 Cal.App.3d 146, 151 [no sua sponte duty to raise right to wear civilian clothing].)[8]

The court did not abuse its discretion or otherwise violate Smith's constitutional rights as to his appearance at trial.

### III. Smith's presence

Finally, Smith claims the court violated his right to be present when it excluded him from the courtroom at various points during the trial. We find no error.

"A criminal defendant accused of a felony has the constitutional right to be present at every critical stage of the trial, including during the taking of evidence." (*People v. Bell* (2019) 7 Cal.5th 70, 114.)[9] However, an unduly disruptive defendant may be removed from the courtroom if, after a warning by the court, he continues his disruptive behavior. (*Bell*, at pp. 116–117.)

---

[8] We reject Smith's alternative ineffective assistance claims based on counsel's failure to obtain civilian clothing, or on any failure to object. A defendant can prevail on such a claim on direct appeal "only if the record on appeal demonstrates there could be no rational tactical purpose for counsel's omissions." (*People v. Lucas* (1995) 12 Cal.4th 415, 442.) It is well-recognized that "there may be instances where for tactical reasons the defendant may wish to be tried in jail garb" (*People v. Taylor* (1982) 31 Cal.3d 488, 496), such as eliciting sympathy from the jury. (*Estelle*, *supra*, 425 U.S. at p. 508; *People v. Williams*, *supra*, 228 Cal.App.3d at p. 151.)

[9] California has statutorily codified this right at sections 977 and 1043. Smith invokes both the statutory and constitutional provisions, but presents no separate statutory argument. We therefore treat the provisions as coextensive. (*People v. Fedalizo* (2016) 246 Cal.App.4th 98, 109, fn. 9.)

"An appellate court applies the independent or de novo standard of review to a trial court's exclusion of a criminal defendant from trial, either in whole or in part, insofar as the trial court's decision entails a measurement of the facts against the law." (*People v. Waidla* (2000) 22 Cal.4th 690, 741.) As with Smith's self-representation claim, we afford "considerable deference to the trial court's judgment as to when disruption has occurred or may reasonably be anticipated." (*Welch*, *supra*, 20 Cal.4th at p. 773.)

Here, Smith was removed from the courtroom at several critical stages of the trial. However, from the outset of the proceedings, the court provided Smith ample, clear warnings that his persistence in disrupting the proceedings would result in removal from the courtroom. Despite the trial court's admonitions, Smith continued to act in a disruptive manner on several occasions, justifying his exclusion in each instance. The trial court took pains to protect Smith's rights under the circumstances. Smith was never excluded longer than part of one day's proceedings, and after at least one exclusion, the court ensured Smith could still hear the proceedings through remote audio. (See *Illinois v. Allen* (1970) 397 U.S. 337, 347 [suggesting trial courts consider alternatives to removal].)

Smith acknowledges the many warnings preceding his exclusions and that he behaved in a disorderly manner throughout his trial. Yet, he argues the exclusions were unjustified because the misconduct leading to those exclusions was insufficiently severe, as it was prompted by legitimate complaints about his representation and presentation in court. Even had Smith's grievances been legitimate (which, as addressed in Parts I and II above, we do not find they were),

Smith provides no authority for the proposition that a legally justified complaint—or even a baseless complaint asserted in good faith—permits a defendant to flatly disregard rules of courtroom decorum in the face of repeated reprimands, and we are aware of none.

Smith further relies on several cases involving exclusion after a defendant acted violently to argue that his conduct was insufficiently egregious to warrant his removal from the courtroom. (See *People v. Johnson* (2018) 6 Cal.5th 541, 560–561.) His reliance is misplaced. None of the cases Smith cites held that violence is a prerequisite to exclusion. As our Supreme Court has recognized in the statutory context, "[a] trial court need not wait until actual violence or physical disruption occurs within the four walls of the courtroom in order to find a disruption." (*People v. Price* (1991) 1 Cal.4th 324, 406.)

The trial court did not err in excluding Smith during various portions of his trial.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.


ADAMS, J.*


We concur:



LAVIN, Acting P. J.



EGERTON, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.