Filed 6/2/26  P. v. Henderson CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHARLES RAY HENDERSON,<br><br>    Defendant and Appellant. | D085245<br><br>(Super. Ct. No. SCD299229) |

APPEAL from a judgment of the Superior Court of San Diego County, Robert O. Amador, Judge.  Affirmed.

Bases & Bases and Arielle Bases for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Robin Urbanski and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

Charles Ray Henderson appeals from a judgment following his convictions on 23 counts of first degree burglary of an inhabited dwelling house in violation of Penal Code sections 459 and 460, subdivision (a), three counts of attempted first degree burglary of an inhabited dwelling house in

violation of sections 459 and 664,[1] one count of second degree burglary in violation of section 459, and 12 counts of conspiracy to commit a crime in violation of section 182, subdivision (a)(1). He contends his convictions should be reversed because the trial court abused its discretion by disallowing evidence that individuals not linked to him had been burglarizing homes in the same vicinity and time frame in which the offenses attributed to him had occurred, and that they had done so using modi operandi similar to those used in the charged offenses. In addition, he contends his sentence should be reversed because, in imposing it, the court did not properly consider trauma he had experienced as a child. The attorney general disagrees, and so do we. Hence we affirm.

## I. GENERAL BACKGROUND

During the winter and spring of 2023, hundreds of burglaries and related offenses occurred throughout affluent areas of San Diego County. Among these were burglaries and attempted burglaries that occurred on: February 10, 23, and 25; March 4, 11, 13, 18, 19, 22, and 23; and May 22 and 23. Using digital location data (i.e., data pertaining to the movement of automobiles, cell phones, and other devices that communicate wirelessly with cell towers), surveillance footage, and other evidence, police placed Henderson—and, in most instances, Charelle Brumfield and Anthony Robinson—at the scene of each of these offenses.

Such evidence also led police to stop a vehicle in which Henderson, Brumfield, and Robinson were traveling. At the time of the stop, no license plate was attached to the vehicle. A search of the vehicle yielded items commonly used as burglary tools, including, for example, bear spray (used in burglaries to incapacitate dogs), window punches (used to break glass),

---

1    All unspecified statutory references are to the Penal Code.

2

walkie talkies, screwdrivers, black gloves, black balaclavas, a grey neck gaiter, and other items of dark clothing. Subsequent searches of Henderson, Brumfield, and Robinson's homes revealed additional such items, along with items that surveillance footage revealed the perpetrators wearing during the charged offenses and items reported stolen from homes burglarized on the dates set forth *ante*.

Henderson, Brumfield, and Robinson were charged with conspiracy and burglary-related offenses in a 42-count information that named Henderson as a perpetrator in 41 of the counts and that alleged several aggravating factors within the meaning of the California Rules of Court, rule 4.421. The case against Robinson was severed, and the case against Henderson and Brumfield proceeded to trial. After two and a half weeks of testimony by 94 witnesses, Henderson was acquitted on two of the 41 counts against him and convicted on the other 39. The trial court then sentenced Henderson to serve a term of 38 consecutive years in state prison.

Henderson timely appealed.

## II. THIRD PARTY CULPABILITY EVIDENCE

Henderson's first contention is that the trial court abused its discretion by disallowing evidence that crews associated with an organization dubbed the Chilean Group were believed by law enforcement authorities to have burglarized homes in the same vicinity and timeframe in which the charged offenses had occurred, and that they had used modi operandi similar to those employed in the charged offenses.

## A. Additional Background

In pretrial motions and in an evidentiary hearing that occurred outside the presence of the jury pursuant to Evidence Code section 402 (402 hearing), the defense sought to introduce at trial, and the prosecution sought to exclude, evidence (in the form of testimony from five police officers and two

detectives) pertaining to a sample of six unsolved burglaries (the six uncharged burglaries) that had occurred on dates other than the dates of the charged offenses and that law enforcement authorities had attributed to the Chilean Group. As the defense argued in limine:

> "[A]round the time of the charged burglaries in this case, there was a similar burglary series being conducted in San Diego County by a group that SDPD Detectives referred to as 'the Chilean Series' . . . The 'Chilean Series' was apparently 'a group of South American Nationals coming to the U.S. committing burglaries,' throughout San Diego County. . .[2] The burglaries were occurring in the same general area and around the same time (February to May 2023) as the burglaries in the instant case . . . .

> "The Defense has been provided with police reports for six individual burglary incidents that were allegedly committed by this crew that occurred from February 5, 2023-June 4, 2023. This is the same time period that the burglaries in this case allegedly occurred. The burglaries all occurred in wealthy neighborhoods in San Diego County, where rear glass doors were smashed, and high value items were stolen.

> ". . . [B]urglaries . . . linked to the 'Chilean Theft Ring' . . . eerily resemble the incidents in this case.

> " . . . Apparently, the 'Chilean Crew' wears masks and hooded sweatshirts to shield their identities. . . This crew often smashed . . . rear sliding glass doors to gain entry into homes located in affluent areas and targeted cash, safes, and jewelry. These characteristics

---

2       According to the defense: "[T]he District Attorney for San Diego County, Summer Stephan, has made several news appearances and comments in local media regarding 'burglary tourism.' She has stated that people involved in these theft groups 'travel to the United States through the ESTA Visa Waiver Program,' which allows them to fill out a quick online questionnaire and receive a 90-day tourist Visa. They then use fraudulent identification or driver's licenses to rent cars to conduct the burglaries."

are identical to the allegations in this case.  As such, the Defense should be able to raise this information to the Jury because it creates a doubt as to the identity of the actual burglars."

The trial court disagreed.  Thus it disallowed evidence pertaining to the Chilean Group and to the six uncharged burglaries noted *ante*.  But it permitted the defense to elicit evidence, and to argue to the jury, that several different burglary crews had been operating in the same communities and timeframe in which the charged offenses had occurred and that these crews had used modi operandi similar to those used in the charged offenses.

## B.    Legal Principles

In challenging the exclusion of evidence pertaining to the Chilean Group and to the six uncharged burglaries, Henderson invokes principles governing the use of evidence of third party culpability to establish a basis for a jury to find reasonable doubt regarding a defendant's guilt.  "Like all other evidence, third party culpability evidence may be admitted if it is relevant and its probative value is not substantially outweighed by the risk of undue delay, prejudice, or confusion, or otherwise made inadmissible by the rules of evidence."  (*People v. Turner* (2020) 10 Cal.5th 786, 816 (*Turner*); accord *People v. Lopez* (2021) 73 Cal.App.5th 327, 339 (*Lopez*).)  " 'To be admissible, [such] evidence need not show "substantial proof of a probability" that the third person committed the act; it need only be capable of raising a reasonable doubt of [the] defendant's guilt.' "  (*Turner,* at p. 817, quoting *People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*); accord *Lopez*, at p. 339.)

But these things said, "[t]he defense that another person was the true perpetrator of the crime is not without limits."  (2 Crim. L. Def. (Thomson Reuters 2025), Third Party Culpability, § 211.)  Thus, our state's Supreme Court has repeatedly emphasized that "we do not require that *any* evidence, however remote, must be admitted to show a third party's possible

5

culpability" (*Hall, supra,* 41 Cal.3d at p. 833, italics added; *accord Turner, supra,* 10 Cal.5th at p. 816) and has "repeatedly upheld the exclusion of third party culpability evidence when the third party's link to a crime is tenuous or speculative." (*Turner,* at p. 817; accord *People v. Bracamontes* (2022) 12 Cal.5th 977, 1001 (*Bracamontes*).) In addition, our high court has repeatedly "explained . . . [that] 'admissible evidence of [third party culpability] points to the culpability of a *specific* third party, not the possibility that some unidentified third party could have committed the crime' " (*Bracamontes,* at p. 1001, quoting *Turner,* at pp. 816–817; see also *Lopez,* at p. 349) and that, " '[f]or the evidence to be relevant and admissible, "there must be *direct* or *circumstantial evidence linking [that specific] third person to the actual perpetration of the crime*." ' " (*Bracamontes,* at p. 1001, quoting *Turner,* at p. 17; see also *Lopez,* 73 Cal.App.5th at p. 341.)

## C.    Analysis

In contending that the trial court should have permitted him to introduce evidence pertaining to the Chilean Group and to the six uncharged burglaries, Henderson argues that the perpetrators in many burglaries attributed to the Chilean Group, like the perpetrators in the charged offenses: (1) operated in crews comprised of two, three, or four members; (2) wore dark clothes, hooded shirts, balaclavas, masks, and gloves; (3) targeted homes in affluent neighborhoods of north central San Diego County; (4) gained access to homes by smashing rear glass sliding doors; (5) ransacked homes in search of valuables; (6) targeted high value items, such as jewelry and cash; and (7) traveled in expensive rented automobiles that blended into the affluent neighborhoods in which they operated.

But—even accepting this argument as true,[3] and setting aside the fact that the Chilean Group is not "a *specific* third party"[4] (*Bracamontes, supra*, 12 Cal.5th at p. 1001; *Lopez, supra*, at p. 349; *Turner, supra*, 10 Cal.5th at pp. 816–817)—we conclude that, considered in relation to modi operandi employed in burglaries generally, none of the characteristics enumerated *ante*, whether considered individually or together, are sufficiently distinctive to qualify as " '*direct* or *circumstantial evidence linking [the Chilean Group] to the actual perpetration of the crime*" ' " within the meaning of the case law. (*Bracamontes, supra*, at p. 1001; *Lopez, supra*, 73 Cal.App.5th at p. 341; *Turner*, at p. 817.) Indeed, according to testimony elicited from detectives during the 402 hearing: "rear door smashes are pretty common in residential burglaries;" "there [were] hundreds of cases where the rear sliding glass door was smashed as a mode of entry" during the relevant timeframe; burglary crews often use expensive vehicles in affluent neighborhoods; it is common for

---

3 Testimony elicited during the 402 hearing was inconsistent with respect to claimed similarities between modi operandi used by the Chilean Group and modi operandi used by the perpetrators of the charged offenses. Thus, for example, whereas one detective testified that, in burglaries attributed to the Chilean Group, the perpetrators usually gained entry by shattering a back sliding glass door, sometimes ransacked the breached homes, and typically wore articles of clothing such as hooded shirts, masks, and gloves that made it difficult to determine their race or hair color, a different detective testified that, in such burglaries, the perpetrators typically did *not* smash rear sliding glass doors to gain entry, but instead cut small holes in the doors just large enough for a person to fit through, that they usually did *not* ransack the homes, and that they often "*weren't* trying to conceal their identity" (italics added).

4 According to one of the detectives who testified during the 402 hearing, the Chilean Group was not a small or discrete group of individuals, but rather a larger "organized crime group" comprised of "a series of random, constantly changing" foreign nationals who would come to the United States on short term tourist visas for the purpose of committing burglaries.

burglarized homes to be ransacked; and it also is common for small items like jewelry and cash to be taken.

Moreover, Henderson's counsel conceded as much throughout the proceedings, including while questioning witnesses, during closing arguments, and during sentencing. Thus, for example, she observed: that "burglary crews are often using high-end vehicles" in affluent neighborhoods; that it is "common" for "burglary crews [to] wear dark clothing in order to hide their identity;" that "[g]loves is something that we see across many burglary crews," that "going into the back area of a home for a burglary" and "smashing the rear sliding glass door" as a "method of entry into a home is not unique;" and that "breaking the rear glass window [and] going for small valuables . . . is just how burglaries are committed." "So the idea that this specific crew ha[d] this really specific M.O. [of] smashing a glass door, using high-end cars, taking high-end property, that's actually not abnormal or uncommon in the world of burglaries at all."

For these very reasons, the trial court did not abuse its discretion in disallowing evidence pertaining to the Chilean Group and to the six uncharged burglaries. Simply stated, such evidence's probative value would have been exceedingly low, and would have been substantially outweighed by the amount of time it would have consumed and the potential confusion it would have engendered. (Evid. Code, § 352 ["The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."]; *Hall, supra*, 41 Cal.3d at p. 834 ["[C]ourts should . . . treat third-party culpability evidence like any other evidence: if relevant it is admissible (§ 350) unless its probative value is substantially

8

outweighed by the risk of undue delay, prejudice, or confusion (§ 352).”];
*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1136 [even where third part
evidence “has been found relevant and admissible, the court may nonetheless
exercise discretion under Evidence Code section 352 to exclude it where its
probative value is substantially outweighed by the risk of undue delay,
prejudice or confusion”]; *People v. Gonzales* (2012) 54 Cal.4th 1234, 1261 [“the
exclusion of weak and speculative evidence of third party culpability does not
infringe on a defendant’s . . . rights].)

### III.   SENTENCING

Henderson’s second contention is that, in determining a sentence, the
trial court improperly applied section 1170, subdivision (b).  To illuminate
this contention, we begin with a brief introduction to the three specific
paragraphs of that subdivision—paragraphs (1), (2), and (6)(A)[5]—that
Henderson contends were improperly applied.

### A.   Legal Principles

Paragraph (1) of section 1170, subdivision (b), provides that:  “When a
judgment of imprisonment is to be imposed and the statute specifies three
possible terms, the court shall, in its sound discretion, order imposition of a
sentence not to exceed the *middle* term, *except as otherwise provided in
paragraph (2)*.”  (Italics added.)

Paragraph (2) in turn sets forth circumstances in which the court may
depart *upward* from the middle term.  (§ 1170*,* subd. (b)(2).)  It provides that:
“The court may impose a sentence *exceeding* the middle term only when there
are circumstances in aggravation of the crime that justify the imposition of a
term of imprisonment exceeding the middle term and the facts underlying

---

5      Paragraphs (1), (2), and (6)(A) of section 1170, subdivision (b), are
hereafter referred to simply as paragraphs (1), (2), and (6)(A).

9

those circumstances . . . have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (*Id.*, italics added.)

Whereas paragraph (2) sets forth circumstances in which the court *may* depart *up*ward from the middle term, paragraph (6)(A) states circumstances in which the court *must* depart *down*ward from the middle term. ( § 1170*, subd. (b)(2).)* It provides that: "Notwithstanding paragraph (1), and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence." (*Ibid.*)

Interpreted together, paragraphs (1), (2), and (6)(A) provide *inter alia* for the low term to be the default in situations in which the defendant is found to have experienced psychological, physical, or childhood trauma that was a contributing factor in the commission of the offense, but allow for an upward departure to the high term when aggravating factors established beyond a reasonable doubt at trial (1) outweigh the mitigating circumstances to such an extent that imposition of the lower term would be contrary to the interests of justice and (2) justify exceeding the middle term. (§ 1170, subds. (b)(1), (2), and (6)(A).)

## B.  Additional Background

In the present case, Henderson waived his right to a jury on the aggravating factors; and, following the verdict, the court conducted a bench trial in which it made true findings beyond a reasonable doubt regarding four circumstances that had been alleged in aggravation within the meaning of

10

California Rules of Court, rule 4.421(a)(8), (a)(9), (b)(3) and (b)(5). These findings were that: (1) the offenses as to which Henderson had been convicted were carried out with planning, sophistication, and professionalism; (2) they involved the taking of items of great monetary value; (3) Henderson had served a prior prison term; and (4) his performance while on probation or parole had been unsatisfactory. (*Ibid.*)

Subsequently, in anticipation of sentencing, the People filed a statement in aggravation requesting a sentence with terms of imprisonment amounting to 39 years four months to be served consecutively. Henderson filed a statement in mitigation requesting terms amounting to 17 years four months to be served consecutively (with additional terms to be served concurrently). And a probation officer filed a report recommending terms amounting to 38 years to be served consecutively.

Among the matters set forth in the probation report was Henderson's history of recidivism as a juvenile and as an adult. With regard to his juvenile history, the report indicated: that the juvenile court had made true findings on allegations against Henderson with respect to a robbery that occurred in 1986 and possession for sale of a controlled substance in 1989; that the juvenile court had sustained petitions as to allegations that in 1991 Henderson had participated in a robbery, transported a controlled substance, and resisted an officer; and that the 1991 incidents had resulted in Henderson being placed in the custody of the California Youth Authority (CYA). Insofar as Henderson's adult criminal history was concerned, the report indicated, *inter alia*: convictions for falsification and assault in 1998

11

and for possession with intent to distribute cocaine in 2000,[6] as well as incidents of violence in which Henderson had engaged while serving his sentence on the conviction arising from the 2000 drug offense.

The probation report also indicated that Henderson "denied current drug or alcohol addiction" and reported statements by Henderson to the probation officer, as follows:

> "I do not like what happened. I did not like being in court and hearing what happened. I apologize to everybody that this happened to[ ]. . .
>
> "[¶ . . . ¶]
>
> "The undersigned explained to the defendant that the victims wanted their family heirlooms returned and asked the defendant to let them know where they could retrieve their items since he wanted to 'apologize to everyone.' He stated, 'No, I feel sorry for what I heard. I did not say I did all of these things. I would not do anything to an old lady. I respect my elders. It made me sad. I did not do all these things that they convicted me of. I did not do them all.'
>
> "The undersigned . . . asked if he wanted to return the items from the victims that he did steal from and he stated, 'I feel remorse. I feel sorry for everybody. It hurts me to know what happens to people. I feel bad for them. I really felt bad for the 80 year old lady. I know if this happened to my grandmother, I would be upset. I did not take any items.' "

Among the materials filed together with the statement in mitigation was a defense investigator's report of an interview with one of Henderson's aunts in which the aunt (referring to Henderson as Charles) had stated that:

---

6    The conviction for the 2000 drug charge resulted in a sentence of 30 years in federal prison that ended up being reduced to a shorter term based on a post-sentence change in the law.

- Charles's father "was a gang member who was always in and out of prison." His mother, Linda, was ill-equipped to raise him. And, throughout his childhood, he was passed around among his mother, his grandmother, the aunt, and Child Protective Services (CPS).

- When Charles lived with Linda and his grandmother, "Linda would leave with different men consistently" and then, on her return, would beat Charles for having played with his toys despite her having told him not to do so in her absence. She also would beat him for escaping through a window to attend elementary school even after she had deadbolted the door to prevent him from doing so. "Linda beat[ ] Charles consistently. [She] would hit him with closed fists, choke him, push him, and cuss him out."

- When the aunt asked the grandmother "why *she* did not stop the beatings" (italics added), the grandmother responded that, "if Linda killed Charles, [then that] would get rid of two problems" because "Linda would be in jail and Charles would be dead."

- "Linda and Charles were homeless on and off;" and "[w]hen he was in 4th or 5th grade, he got taken away by Child Protective Services" for a period of time.

- The neighborhoods in which Charles lived as a child were "heavily gang infested" and "unsafe." He "would have to fight when going to the store or walking down the street," and he "began to become gang affiliated."

- When Charles was 15 to 16, his father got out of prison and recruited Charles to sell marijuana for him.

- According to another aunt, "Linda would make Charles do drive by shootings while living in Los Angeles[,] and Linda would be the driver."

Also among the items filed with the statement in mitigation was a report in which a psychologist who had interviewed Henderson and reviewed information provided by others stated that:

- Henderson's father "was not involved much in Mr. Henderson's upbringing, as his father was in and out of jail and prison;" and "he reported not having a prominent father figure in his life."

13

– "Henderson experienced teasing and isolation[ ] from peers for being in special education and probable exploitation from others in his rough neighborhood that was noted for poverty and gang entrenchment."

– Henderson sustained cognitive injuries and facial disfigurement as a result of being struck in the head with a stick when he was six or seven years old and as a result of being shot in the face when he was 20 years old.

– Henderson could not read.

– Henderson "lost friends due to gang violence as young as the age of 12."

– Henderson "was an East Coast Crip."

At the sentencing hearing, the prosecutor expressed himself forcefully in response to what he characterized as an effort on the part of the defense to downplay the seriousness of the offenses as to which Henderson had just been convicted at trial, his involvement in those offenses, and his history of recidivism; and he argued that the trauma Henderson had experienced as a child many years earlier could not have contributed to his commission of the offenses:

> "Mr. Henderson does not come before this Court as a 26-year-old or 22-year-old young man with no criminal history. At the time of these crimes, he was 48 years old . . . I know we're going to hear . . . about . . . his upbringing, his family life. It sounds like it was difficult. It sounds like there was trauma . . . But . . . to say, as the defense said, that he was . . . not raised in an environment that would provide guidance as to right and wrong, well, certainly, the court system at a very early age tried to provide that guidance to . . . Mr. Henderson because at the age of 11, he had a true finding for robbery; at the age of 14, a true finding for sale of, looks like, crack cocaine; at the age of 16, a true finding for another robbery and was committed to . . . what was then the California Youth Authority, which is the ultimate

14

sanction for juvenile offenders at that time. And you don't get to CYA back then, as the Court well knows, unless you're an offender that can't be handled in the local justice system.

"And even after that . . . he had another possession or sale [or] transportation of controlled substances. [And] that's just his juvenile history. To say there was no guidance, perhaps not in his household, but certainly, the court system tried to provide that guidance and support. I've always firmly believed that the juvenile justice system is the one true place that really can make a difference in many offenders' lives. And it apparently did not because Mr. Henderson went on [to be convicted as an adult].

"[¶ . . . ¶]

"[The] defense asks . . . for the Court to impose the low term under Penal Code § 1170 and recites various factors relating to his youth. And the Court should not do that in this case because there's no evidence that the childhood issues or his background contributed to the commission of these offenses.

". . . I submit that the aggravating factors and circumstances of the crimes in this case, the seriousness of the crimes in this case outweigh any mitigating circumstances the defense can point to and that imposition of the lower term for the principal term in this case would be contrary to the interest of justice in this case."

Henderson's defense counsel pushed back on the prosecutor's arguments. She cited evidence of work Henderson had done following his release from federal prison, including involvement in helping to mediate gang wars and in programs to encourage youth to avoid crime—as evidence that he had reformed. She argued the burglary spree "was an aberration for him." She suggested the death of his grandmother—"the woman that basically raised him"—had triggered a sudden descent into drug abuse, gambling, and infidelity, and that it was that descent that had led Henderson to deviate

15

from the prosocial path he had been on and to recidivate with the burglary spree.  In addition, she argued, he felt regret and remorse.

Thereafter, Henderson addressed the court.  He echoed several of the themes his defense counsel had expressed.  So doing, he attributed his participation in the burglary spree to a drug addiction, and he expressed shame, embarrassment, regret, and remorse.  Thus, for example, he said:

> "I'd like to apologize, Wife.  You hear me, Wife?  [¶]  And to my family, my victims, like, to sit up here for all that time to hear what was going on, I never knew that I was hurting people like that.  Just to get high, I mean, I never thought I would be sitting right here again.  I let 12 days ruin my life.  Like, I—I sit and think about that all the time, like 12 days of ruining my whole life. It's—what I did, what I was, that's not me."

The trial court acknowledged the evidence and arguments pertaining to Henderson's childhood.  Remarking on that evidence, it observed that Henderson had been "dealt a bad hand in life," and it agreed that Henderson had experienced significant childhood psychological trauma that qualified as a factor in mitigation for sentencing purposes within the meaning of paragraph (6)(A).  (See also Cal. Rules of Court, rule 4.423(b)(3) ["Circumstances in mitigation include that . . . [t]he defendant experienced psychological, physical, or childhood trauma."].)

In the course of making these findings, the trial court also commented on three aspects of Henderson's youth, as follows:  First, it remarked on Henderson's "significant . . . history" in the juvenile justice system, including his time at the CYA.  So doing, it described the CYA as "the last stop for recalcitrant minors" and added that youths from Los Angeles were not sent there "unless they [were] recalcitrant or dangerous."  Second, adverting to Henderson's difficult childhood, the court speculated that that significant history in the juvenile justice system might be attributable in part to the

16

"things that happened in that time period . . . regarding the area he grew up in, what was happening to him and . . . being passed around." And third, the court remarked on the passage of time, observing that "that happened when he was prior to 18 years old. He's now 48. This is 30 years later."

On the basis of this last observation (regarding the passage of time), the court found, notwithstanding the difficult circumstances of Henderson's youth, that the trauma Henderson had experienced as a child did "not . . . carr[y] much weight at this . . . time."[7] Then, weighing that mitigating factor against the four aggravating factors, the court concluded that the latter outweighed the former.

The court then spoke about the effects the burglaries had had, and would continue to have, on the victims. Thereafter, it turned to the topics of remorse, responsibility, and self-reflection:

> "[T]he defendant, when he gave a statement to Probation, his comment was mainly, [']I feel sorry for those people' . . . . But his second statement was, 'it wasn't me.' He doesn't take responsibility. And unless the remorse is for your own actions, it's truly not remorseful . . . So those are great considerations for the Court in regards to what has happened in this particular case.
>
> "[¶ . . . ¶]
>
> ". . . This defendant could have stopped at anytime [*sic*]. . . He says to . . . probation [and] . . . to the psychologist that drugs weren't really a problem.
>
> And so why did he do these particular crimes? Well, he says that his life changed because he had deaths in his family. COVID was happening at that time. Lots of people had deaths in their family. It was a terrible time in this

---

7    In making this statement, the trial court appears to have rejected the prosecutor's contention that Henderson's childhood trauma did not contribute to the burglary spree at all.

country. But to all of a sudden start to go on a burglary run which lasted five months which impacted multiple people and had other people involved is unconscionable to this Court. He's a threat to our community. He will remain a threat to our community. The Court sees very little insight into what actually happened.

On these bases the court in the exercise of its discretion sentenced Henderson to a term of imprisonment of 38 years, comprised of: (a) an upper term of six years on one of the first degree burglary convictions, which the court deemed the principal term (see generally §§ 461, subd. (a), 1170.1, subd. (a)); (b) 16 months (equal to one-third of the middle term) on each of the other 22 first degree burglary convictions (*ibid.*); and (c) eight months (equal to one-third of the middle term) on the second degree burglary conviction and on each of the three attempted burglary convictions (see generally §§ 461, subd. (b), 664, subd. (a), 1170, subd. (h)(1), 1170.1, subd. (a))[8]—all to be served consecutively (see generally § 669).

## C.    Analysis

In contending the trial court improperly applied paragraphs (1), (2), and (6)(A), and that the sentence it imposed thus constituted an abuse of discretion, Henderson argues: (1) that "[t]he court was inappropriately dismissive of the lengthy and detailed documentation of [his] history of trauma;" (2) that it was "inconsistent and unfair [for the court] to determine on the one hand that [his] childhood abuse happened so long ago that it didn't 'carry much weight' at sentencing and on the other hand, consider [his] juvenile history (ages 11-14) to support an aggravated term;" and (3) that the court should not have relied on Henderson's pre-sentencing "denial of his role

---

8      A term of six years was imposed but stayed (see generally § 182, subd. (a)) for each of the 12 conspiracy convictions.

in at least some of the crimes to find he lacked remorse and therefore impose the upper term." We conclude that the trial court expressed itself inartfully, but it did not abuse its discretion.

In arriving at this conclusion, we begin with the observation that "[t]he abuse of discretion standard is highly deferential." (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 298 (*Mendoza*).) "When, ' "as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*Ibid.*) We note also that, "[a]s a reviewing court, we confront a cold record without the trial court's benefit of observing firsthand the . . . demeanor of the witness." (*People v. Lewis* (2001) 26 Cal.4th 334, 359.)

As noted *ante*, the first of Henderson's three arguments pertaining to sentencing is that the trial court was inappropriately dismissive of the trauma Henderson experienced as a child. We certainly see how one particular remark the trial court made during the sentencing proceedings could be construed as insensitive. We refer here to the second sentence in this passage from the hearing transcript: "Mr. Henderson was dealt a bad hand in life. That happens all of the time in matters of what happens with people afterwards and what they have to deal with and such."

Although this sentence's structure renders its meaning somewhat opaque, we recognize that one way in which it might be interpreted is as an assertion that the upbringing Henderson experienced, though harsh, was nonetheless not out of the ordinary. Were we to interpret the sentence in this way, then we would agree with Henderson that the court was inappropriately dismissive. But we do not interpret the court's remark in this way. Instead,

we consider it in the context of the arguments that the prosecutor had just made relating to guidance that Henderson would have been provided through the juvenile justice system.  And, considering the referenced remark in this context, we construe it as just a clumsy way of saying that it is not unusual for a person to be dealt a bad hand in life, and that it is important to consider what that person has done with the proverbial bad hand they have been dealt.

Interpreting the court's remark in this fashion leads us to Henderson's second argument pertaining to sentencing.  That is, his argument that the trial court was inconsistent in its consideration of matters relating to his childhood.  Inasmuch as Henderson had many years and the interposition of the juvenile justice system (and the adult justice system) to help guide him toward a law-abiding path, we conclude it was neither inconsistent nor unfair for the court to conclude that his experience of trauma as a child carried much less weight as a mitigating factor at age 48 than it might have carried at, say, age 28, and to simultaneously conclude that a criminal history of recidivism that had begun when Henderson was a child and persisted into adulthood carried some weight.

As for the third argument pertaining to sentencing (the argument that the court should have disregarded the statements partly denying responsibility that Henderson made at his probation interview), we recognize that Henderson expressed remorse at the sentencing hearing.  But, even acknowledging that fact, we cannot conclude that—in determining that Henderson had not taken responsibility and had exhibited very little insight into his offenses—the court was acting in a manner that was "arbitrary, capricious or patently absurd" (*Mendoza, supra*, 88 Cal.App.5th at p. 298), let alone so much as to as to " ' " 'result[ ] in a manifest miscarriage of

justice.' " ' " (*Ibid*.)  Indeed, in the same remarks in which Henderson expressed remorse at the sentencing hearing, he also repeatedly downplayed his responsibility ("that's not me," "I never knew that I was hurting people") and attributed his offenses to the influence of drugs that, just three weeks earlier, he had told the probation officer he never used.

Under these circumstances we cannot conclude the trial court abused its discretion.

## IV.   DISPOSITION

The judgment and sentence are affirmed.

KELETY, J.

WE CONCUR:

DATO, Acting P. J.

RUBIN, J.